[No. A112738. First Dist., Div. Four. July 28, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
NEAL FIU, Defendant and Appellant.

COUNSEL

Stephen B. Bedrick, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Stan Helfman and Aileen Bunney, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**SEPULVEDA, J.**—Defendant Fiu was convicted by jury trial of second degree murder (Pen. Code, § 187),[1] and of conspiracy to commit assault with force likely to cause great bodily injury. (§§ 182, subd. (a)(1), 245, subd. (a)(1).) A gang enhancement was found true as to each crime. (§ 186.22, subd. (b)(1).) He was also convicted of street terrorism (§ 186.22, subd. (a)) and assault with force likely to cause great bodily injury (§ 245, subd. (a)(1)).[2] One prior strike was found true in a bench trial, and the court sentenced defendant to 40 years to life in state prison. (§§ 187, 667, subds. (b)–(i), 1170.12.) Defendant argues on appeal that the trial court erred by failing to instruct the jury on the theory of supervening cause, by shifting the burden of proof to defendant on the question of withdrawal by an aider and abettor, and by failing to dismiss the grand jury indictment for insufficient probable cause. Defendant also contends that the trial court erred in admitting and instructing upon the predicate felonies needed to prove a pattern of criminal gang activity required for the gang enhancements, and erred in imposing a consecutive 10-year term for the gang enhancement. Finally, defendant claims he was denied a fair trial as a result of racially discriminatory jury selection. We accept respondent's concession as to the consecutive 10-year term on a gang enhancement and order the abstract of judgment to be corrected accordingly. In all other respects, we affirm.

## BACKGROUND

According to testimony given at trial, on the night of July 24 and in the early morning hours of July 25, 2003, defendant Neal Fiu and four teenage members (Daniel G. (Danny), Joey O., Sammy V., and Brandon V.)[3] of the street gang Sons of Death (SOD) were on defendant's front porch, drinking alcohol. Also present were Javier Cervantes (Javi) and Juan Cervantes (Juan). Defendant was a longtime member of SOD and, according to Danny G., commanded respect from the young members.

While they were sitting on the porch, Salvador Espinoza walked past; he cursed, yelled the name of a rival gang, and threw a gang sign. Taking this as a challenge, defendant and the four teenagers approached Espinoza. After Brandon V. pushed Espinoza, Danny G. pulled out a .38-caliber weapon and aimed it at Espinoza's face. Defendant told him not to shoot, saying they

---

[1] All further statutory references are to the Penal Code unless otherwise noted.

[2] Defendant was found not guilty of sales of a nonnarcotic controlled substance. (Health & Saf. Code, § 11379.)

[3] At the time of the incident, the four boys were juveniles. All were charged in juvenile court with murder; all admitted violations of section 245, subdivision (a)(1) (assault with force likely to inflict great bodily injury) in exchange for agreements to testify.

should beat up Espinoza instead. Espinoza tried to escape, but was caught and thrown to the ground. The teenagers and defendant punched and kicked Espinoza in the head and body until he lost consciousness.[4] The group left Espinoza lying on the ground, apparently still alive, and everyone returned to the porch to continue drinking.

Shortly thereafter, Ezekiel Johnson[5] arrived at the house.[6] At this point, defendant was either inside his house or in the backyard. The teenage gang members took Johnson to where Espinoza was lying, and Johnson said that he wanted to kill him. The four teenagers resumed kicking Espinoza. Javi smashed Espinoza's head against a parked car. Johnson put a milk crate over Espinoza's neck and jumped on it. Finally, Johnson and Joey O. stabbed Espinoza in the neck at least twice. Afterward, Johnson and Javi went into the house to wash blood from their hands. Johnson then drove the four young gang members to the home of Danny G.'s mother. She washed the blood from their clothes.

The grand jury returned an indictment charging defendant with murder (§ 187—count 1), conspiracy to commit murder, robbery, and assault with force likely to cause great bodily injury (§§ 182, subd. (a)(1), 187, 211, 245, subd. (a)(1)—count 2), and street terrorism (§ 186.22, subd. (a)—count 3). The indictment alleged that defendant committed the first two counts for the benefit of a street gang (§ 186.22, subd. (b)(1)), and that he had two prior strikes, pursuant to sections 667, subdivisions (a) to (i), and 1170.12. A jury found defendant guilty of second degree murder, conspiracy to commit assault with force likely to cause great bodily injury, and street terrorism. The jury found true the allegations that the first two counts were committed for the benefit of a street gang. Defendant admitted one strike allegation. The court dismissed the second strike allegation (pursuant to stipulation of the parties), and sentenced defendant as follows: murder, 15 years to life, doubled to 30 years to life due to the prior strike, plus 10 years for the first gang enhancement (§ 186.22, subd. (b)(1)), totaling 40 years to life. Sentences on

---

[4] At trial, the four juveniles gave differing accounts about the strength and targets of defendant's blows to Espinoza. All agreed that defendant kicked Espinoza. Danny G. told the police it was only once in the stomach, not in the head or face, but at trial testified it might have been in the head and body. Sammy V. and Joey O. testified that defendant kicked Espinoza in the head or face multiple times, but Brandon V. disputed that account, saying defendant kicked him once in the upper body.

[5] Codefendant Johnson was originally charged in the same action with Fiu, but the trial court granted defendant's motion to sever. Johnson was subsequently convicted of first degree murder in a separate trial.

[6] Danny G. testified that Johnson arrived 10 to 15 minutes after the first attack on Espinoza.

counts 2 (including the second gang enhancement) and 3 were stayed pursuant to section 654.[7] Defendant timely appealed.

## DISCUSSION

### A. *Failure to Instruct on Supervening Cause.*

Defendant contends that the trial court erred as it failed to instruct, sua sponte, on supervening cause. Because Johnson came along some 10 to 15 minutes after defendant's participation in the initial attack on the victim, and again attacked the victim (without defendant's participation), defendant argues that the court should have instructed the jury on superseding intervening cause.

The trial court instructed with a modified version of CALJIC No. 3.40, which discusses causation, as follows: "To constitute the crime of Murder or Manslaughter there must be in addition to a death of a human being an unlawful [act] [or] [omission] which was a cause of that death. [¶] The criminal law has its own particular way of defining cause. A cause of death is an [act] [or] [omission] that sets in motion a chain of events that produces *as a direct, natural and probable consequence* of the [act] [or] [omission] the death in question and without which the death would not occur." (Italics added.) The court also instructed with CALJIC No. 3.41, which discusses concurrent causation and provides, "There may be more than one cause of death. When the conduct of two or more persons contributes concurrently as a cause of death, the conduct of each is a cause of the death if that conduct was also a substantial factor contributing to the result. A cause is concurrent if it was operative at the moment of the death and acted with another cause to produce the death." These instructions on causation, defendant argues, were insufficient as Johnson's actions could have been found by the jury to be a superseding intervening act[8] which broke the chain of causation; under those circumstances defendant's acts would not be the proximate cause of the victim's death. The failure to properly instruct on proximate cause, defendant claims, violated the federal due process clause and requires reversal under the *Chapman* standard.[9] We disagree.

---

[7] Section 654 provides that "[a]n act or omission that is punishable in different ways by different provisions of law shall . . . in no case . . . be punished under more than one provision." The trial court accordingly stayed the sentences imposed on counts 2 and 3.

[8] Defendant uses the term "supervening" act. Case law appears to variously use the terms "superseding intervening act," "independent intervening act," and "supervening act," to describe an act occurring after a defendant's act, which is unforeseeable and breaks the chain of causation.

[9] *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824] (*Chapman*).

First, the lack of amplifying language was waived by defendant's failure to request it below. "A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language." (*People v. Lang* (1989) 49 Cal.3d 991, 1024 [264 Cal.Rptr. 386, 782 P.2d 627].) This concept is aptly demonstrated in *People v. Alvarez* (1996) 14 Cal.4th 155, 221–222, and footnote 27 [58 Cal.Rptr.2d 385, 926 P.2d 365], a homicide case in which the trial court did not instruct on causation pursuant to either CALJIC No. 3.40 or No. 8.55. Defendant claimed on appeal that the trial court erred by failing to do so. The California Supreme Court held that the trial court had adequately instructed on proximate cause as it required that the perpetrator *kill* the victim, thereby requiring the act to *cause* the death. Defendant contended that the trial court should have amplified this instruction by referring to and explaining proximate cause, by use of the CALJIC pattern instruction, CALJIC No. 8.55.[10] The court held, "Had he desired such an amplification, he should have requested it of the superior court. He made no request of this sort."[11] (*Alvarez, supra*, at p. 222.)

▮ Defendant claims, however, that the court was required to instruct on supervening cause, sua sponte. "In considering a claim of instructional error we must first ascertain what the relevant law provides, and then determine what meaning the instruction given conveys. The test is whether there is a reasonable likelihood that the jury understood the instruction in a manner that violated the defendant's rights." (*People v. Andrade* (2000) 85 Cal.App.4th 579, 585 [102 Cal.Rptr.2d 254].) A court is required to instruct on the law applicable to the case, but no particular form is required; the instructions must be complete and a correct statement of the law. (*Ibid.*) The meaning of instructions is tested by "whether there is a 'reasonable likelihood' that the jury misconstrued or misapplied the law in light of the instructions given, the entire record of trial, and the arguments of counsel." (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 276 [107 Cal.Rptr.2d 160].) " '[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' [Citation.]" (*People v. Burnett* (2003) 110 Cal.App.4th 868, 875 [2 Cal.Rptr.3d 120].) Thus, absence of an essential element in a given instruction may be

---

[10] CALJIC former No. 8.55 provided, "To constitute murder . . . there must be, in addition to the death of a human being, an unlawful act which was a proximate cause of that death. [¶] A proximate cause of a death is a cause which, in natural and continuous sequence, produces the death, and without which the death would not have occurred." (CALJIC former No. 8.55 (5th ed. 1988).)

[11] The court noted that defense counsel had represented below that he was not going to " 'make any issue out of the proximate cause . . . .' " (*People v. Alvarez, supra*, 14 Cal.4th at p. 222.)

supplied by reference to another instruction, or cured in light of the instructions considered as a whole. (*Ibid.*)

 A "cause of [death] is an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the [death] and without which the [death] would not occur." (CALJIC No. 3.40.) Even if the death occurs in an unanticipated manner, a defendant is still liable unless a superseding intervening act breaks the chain of causation. "To relieve a defendant of criminal liability, an intervening cause must be an unforeseeable and extraordinary occurrence. [Citation.] The defendant remains criminally liable if either the possible consequence might reasonably have been contemplated or the defendant should have foreseen the possibility of harm of the kind that could result from his act." (*People v. Crew* (2003) 31 Cal.4th 822, 847 [3 Cal.Rptr.3d 733, 74 P.3d 820] (*Crew*).)[12] Worded differently, " '[W]here [an] injury was brought about by a later cause of independent origin . . . [the question of proximate cause] revolves around a determination of whether the later cause of independent origin, commonly referred to as an intervening cause, was foreseeable by the defendant or, if not foreseeable, whether it caused injury of a type which was foreseeable. If *either* of these questions is answered in the affirmative, then the defendant is not relieved from liability towards the [victim]; if, however, it is determined that the intervening cause was not foreseeable *and* that the results which it caused were not foreseeable, then the intervening cause becomes a supervening cause and the defendant is relieved from liability for the [crime].' " (*Pappert v. San Diego Gas & Electric Co.* (1982) 137 Cal.App.3d 205, 210 [186 Cal.Rptr. 847], original italics; see also *People v. Brady* (2005) 129 Cal.App.4th 1314, 1326 [29 Cal.Rptr.3d 286].) As the California Supreme Court explained in *People v. Cervantes, supra,* 26 Cal.4th at page 871, " ' "If an intervening cause is a normal and reasonably foreseeable result of defendant's original act the intervening act is 'dependent' and not a superseding cause, and will not relieve defendant of liability. [Citation.] '. . . The consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough. . . . The precise consequence need not have been foreseen; it is enough that the defendant should have foreseen the possibility of some harm of the kind which might result from his act.' [Citation.]" ' " To break the chain of causation, the intervening act must

---

[12] Of course the intervening act may be so attenuated, due to the passage of a significant period of time, that a defendant's act is no longer considered the proximate cause of the victim's death, for " 'at some point the required causal nexus would have become too attenuated . . . .' " (*People v. Cervantes* (2001) 26 Cal.4th 860, 871 [111 Cal.Rptr.2d 148, 29 P.3d 225]; see *People v. Roberts* (1992) 2 Cal.4th 271, 319–320, 321 [6 Cal.Rptr.2d 276, 826 P.2d 274].) Johnson's acts, some 10 to 15 minutes after defendant's actions, were not so temporally attenuated.

be an " ' "unforeseeable . . . extraordinary and abnormal occurrence." ' " (*Ibid.*)

▮ There are no standard CALJIC instructions on superseding intervening acts; when appropriate, corollary civil instructions on this aspect of causation may be used. (*People v. Brady, supra*, 129 Cal.App.4th at p. 1328.)[13] Defense counsel below did not request such clarifying instructions, nor were any given by the court. While we agree with defendant that causation instructions must be given sua sponte if called for under the facts of the case (*People v. Bland* (2002) 28 Cal.4th 313, 334–335 [121 Cal.Rptr.2d 546, 48 P.3d 1107]), we do not agree that the instructions given in the present case were lacking. CALJIC No. 3.40 correctly indicates, in essence, that liability would not be cut off for an intervening act if the victim's death was nevertheless a "direct, natural and probable consequence" of defendant's original act. (CALJIC No. 3.40.) *People v. Temple* (1993) 19 Cal.App.4th 1750, 1754–1756 [24 Cal.Rptr.2d 228] held this instruction to be an adequate statement of the law, without need to amplify (even upon request) with "reasonable foreseeability" language. The court noted a lack of any such requirement in Supreme Court precedent, so long as jurors were not instructed to disregard foreseeability. (*Id.* at p. 1755–1756.) Implicit in *Temple*'s reasoning is an assumption that foreseeability is an important component of causation, but that the language in CALJIC No. 3.40 requiring an injury or death to be a direct, natural, and probable consequence of a defendant's act necessarily refers to consequences that are reasonably foreseeable. We concur with this analysis. The Supreme Court has cited *Temple* with approval, noting that the CALJIC instructions, as given here, conform to its precedent faulting earlier versions that used the term "proximate" cause. (*People v. Bland, supra*, 28 Cal.4th at pp. 334–335.) The high court thus appears to have endorsed the "natural and probable" language of CALJIC No. 3.40. (See *People v. Roberts, supra*, 2 Cal.4th at pp. 321–322 [if victim's eventual death not natural and probable consequence of defendant's act, liability cannot attach].)

Thus, the instructions given were a correct statement of the law. Further, the instructions were responsive to the evidence. Under the facts of the present case, defendant encouraged several other gang members to beat the victim, and participated in his beating. When the victim attempted to flee, they chased him around the corner from defendant's residence, where they caught him and administered the beating.[14] They left the victim lying

---

[13] See CACI No. 432, discussed *post*, defining a superseding intervening act.

[14] In an attempt to clarify the location where the victim was left after the first beating, in response to defendant's petition for rehearing, we ordered the record augmented with the crime scene diagram (People's exhibit No. 9) and the crime scene photographs (People's exhibit Nos. 8a–8rr). (Cal. Rules of Court, rule 8.155(1)(A).) The victim was apparently first

unconscious on the ground, around the corner from defendant's house.[15] When Johnson came by 10 to 15 minutes later, the young gang members showed Johnson where the victim was lying. Johnson began to kick the victim and put a milk crate on the victim's neck and jumped on it. The young gang members participated in the further assault on the victim and the group removed the victim's clothes and shoes. Johnson stabbed the victim twice in the neck. Defendant was not out front, but at some point he told Johnson not to kill the victim.[16] The autopsy surgeon testified that the knife wounds inflicted upon the victim were not a cause of his death. The cause of death, according to the autopsy surgeon, was blunt force trauma to the head. There was bleeding inside the victim's head and swelling of his brain, due to multiple impacts to his head. Death resulted from a combination of blows; no one single blow was severe enough to do all of the damage. There were at least a half-dozen separate blows to the victim's head which combined to cause his death. No single blow was sufficient to cause death by itself.[17]

■ There was no superseding intervening act. Whether or not Johnson's arrival and actions were themselves foreseeable, the death of the victim due to beating was. Once defendant and the young gang members beat the victim severely, rendering him unconscious and leaving him lying outside, around the corner from defendant's residence, it was not unforeseeable that he might die due to their actions or the type of injuries they inflicted. Further, defendant left the young gang members, at least one of whom had behaved as though he intended to kill the victim (by shooting him) on his porch drinking. He left the injured victim in proximity to these individuals, and at their mercy.[18] That someone, whether Johnson or one of the gang members, would again assault the victim was certainly foreseeable. Assuming the specific acts of Johnson were not themselves foreseeable, the type of harm or injury which

attacked near the corner of Maine Avenue and South 15th Street; he was knocked down after he went around the corner. At least one witness testified that the victim was knocked down twice in this area. That witness also indicated that the victim was in a different location when the second attack, joined in by Johnson, occurred. The victim's body was located on Maine Avenue, just around the corner from defendant's residence on South 15th Street, in a grass parking strip. From the backyard of defendant's residence, one can see out to Maine Avenue.

[15] Again, the accounts of the young gang members differed. In sum, it appears that the victim was beaten until he lost consciousness; however, he may have regained consciousness before the second beating, in which Johnson participated.

[16] One young gang member's account of the events indicated that Johnson came into defendant's backyard to inquire about the victim, and it was at this point that defendant told Johnson not to kill the victim.

[17] The autopsy surgeon could not ascertain if certain patterned injuries on the victim's head were caused by, or were consistent with, a milk crate or a shoe, without comparing the specific objects with the pattern of injuries.

[18] Again, at least one young gang member did testify that defendant told them to leave the victim alone and to go home after their initial attack on the victim and before Johnson's arrival on the scene.

they caused (to the extent they contributed at all to the victim's death) was certainly foreseeable. "The consequence need not have been a strong probability; a possible consequence that might reasonably have been contemplated is enough. . . . The precise consequence need not have been foreseen; it is enough that the defendant should have foreseen the possibility of some harm . of the kind that might result from his act. [Citations.]" (1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Elements, § 41, p. 247.) Blows to the head, similar to those inflicted by defendant and the young gang members initially, caused the victim's death. This type of harm was clearly foreseeable; no reasonable jury could have found that it was not. (*Crew, supra*, 31 Cal.4th at p. 847.) The victim's death was a natural and probable consequence of defendant's actions. (*People v. Roberts, supra*, 2 Cal.4th at p. 320, citing Model Pen. Code, § 2.03, subd. (2)(b) ["when purpose or knowledge of a result is an element of an offense, the actor is not liable for an unintended or uncontemplated result unless, as relevant here, 'the actual result involves the same kind of injury or harm as that designed or contemplated and is not too remote or accidental in its occurrence to have a . . . bearing on the actor's liability or on the gravity of his offense' "].)[19]

■ Additionally, "any error was harmless under any standard because here it is clear beyond a reasonable doubt that a rational jury would have found defendant guilty absent any error. [Citation.]" (*Crew, supra*, 31 Cal.4th at p. 847.) As the court in *Crew* explained in response to the defendant's argument that the standard CALJIC homicide proximate cause

---

[19] Defendant cites the following language from Hart and Honoré, Causation in the Law (2d ed. 1985) page 326, as quoted in *People v. Cervantes, supra*, 26 Cal.4th at page 871, "One commentary has described the rationale for finding the acts of a second party to be a remote, independent intervening (and superseding) cause in these terms: 'The free, deliberate, and informed intervention of a second person, who intends to exploit the situation created by the first, but is not acting in concert with him, is normally held to relieve the first actor of criminal responsibility.' " That paragraph goes on, however, to clarify, "One must distinguish, however, the situation where the first actor's conduct was sufficient in the existing circumstances to bring about the harm . . . from that where it was not sufficient without the intervention of the second actor." (Hart & Honoré, *supra*, p. 326, fn. omitted.) The treatise goes on to explain that in the second situation most decisions relieve the first actor of responsibility, but where the first act is sufficient to cause the harm, "the case for holding the first actor responsible despite the voluntary intervention of the second is naturally much stronger." (Hart and Honoré, *supra*, at p. 329.) Of course, where "the conduct of two or more persons contributes concurrently as a cause of [death], the conduct of each is a cause of the [death] if that conduct was also a substantial factor contributing to the [death]." (CALJIC No. 3.41.) In that situation, as discussed *post*, even an independent intervening act of another person does not relieve defendant of criminal liability for the death.

instruction (CALJIC No. 8.55)[20] created a mandatory presumption, precluding consideration of intervening causes, "Not so. When there is an intervening cause, the initial cause is not one that continues to operate in a natural and continuous sequence." (*Crew, supra,* at p. 847.) Similarly here, had there been any supervening act, the victim's death would not have been produced "as a direct, natural and probable consequence" of a chain of events set in motion by defendant's actions. CALJIC No. 3.40 adequately conveys this concept. Since Johnson's acts, or at least the harm they caused, were foreseeable, the victim's death was a direct, natural, and probable consequence of defendant's actions. Further, "[e]ven if [Johnson]'s actions could be described as an independent intervening cause of [the victim]'s death, they would relieve defendant of criminal liability only if the jury found that [defendant's action] was not a concurrent cause of [the victim's] death." (*Crew, supra,* at p. 847.) As the court explained in *Pappert v. San Diego Gas & Electric Co., supra,* 137 Cal.App.3d at page 211, " 'Numerous cases have declared that if the defendant's conduct exposes persons in the class to which [the victim] belongs to a foreseeable risk of injury, and his act or omission contributes substantially to injury of that nature actually occurring, he may be held liable notwithstanding the fact that an unforeseeable independent intervening act is a concurring cause.' [Citations.]"

The facts of the *Crew* case are instructive. The defendant told a friend that he took his wife into the woods, shot her in the back of the head, rolled her body down a ravine, and covered it with blankets. The next evening, the defendant and another friend drove to where defendant had left the body; the body "had moved." (*Crew, supra,* 31 Cal.4th at p. 831.) The defendant became upset and ran back to the truck they had driven to the location. His friend went down the ravine and tried to strangle the victim and break her neck. He ultimately cut off her head. The defendant and his friend later put the victim's body in a 55-gallon drum filled with cement and buried it in the friend's backyard. They put her head in a five-gallon bucket filled with cement and threw it off the Dumbarton Bridge. The court instructed the jury with CALJIC Nos. 3.40, 3.41, and 8.55. On appeal, the defendant argued that

---

[20] CALJIC No. 8.55 is the standard CALJIC instruction covering causation in homicide cases. (See fn. 10, *ante.*) As the court explained in *Alvarez,* "We note in passing that, in light of our all but express disapproval in *People* v. *Roberts*[, *supra,*] 2 Cal.4th [at pages] 311–313, CALJIC No. 8.55 was revised in 1992 to remove 'proximateness': 'To constitute . . . murder . . . there must be, in addition to the death of a human being, an unlawful act which was a cause of that death.' " (*People v. Alvarez, supra,* 14 Cal.4th 155, 222, fn. 27.) While CALJIC No. 8.55 was requested by the prosecution in the present case, it does not appear the trial court instructed upon it (despite indicating that it intended to do so). The concept covered by the newer version of CALJIC No. 8.55 was, however, adequately addressed in CALJIC No. 3.40, as modified and given by the trial court, as CALJIC No. 3.40 indicated that there must be an act or omission that was a cause of the death. (See full modified text of CALJIC No. 3.40, as given in the present case, *ante.*)

the trial court erred by not instructing the jury that his friend's actions in strangling the victim and cutting off her head could be an independent intervening act that broke the causal connection between the defendant's shooting of the victim and her death. The Supreme Court rejected this argument, stating that "[t]he defendant remains criminally liable if either the possible consequence might reasonably have been contemplated or the defendant should have foreseen the possibility of harm of the kind that could result from his act." (*Crew, supra,* at p. 847.) The court found that a jury could not possibly have found that the defendant's friend's attempt to make sure the victim was dead was unforeseeable. The court further found that any error was harmless under any standard, because even if the defendant's friend's actions were independent intervening causes of the victim's death, that would relieve the defendant of criminal liability only if the trier of fact found that his act of shooting the victim in the head was not a concurrent cause of her death. (*Ibid.*) Similarly here, even if Johnson's acts were an independent intervening cause of the victim's death, they would relieve defendant of liability only if defendant's actions in beating the victim and kicking him in the head were not a concurrent cause of his death.[21]

In addition to the standard causation instructions given, as previously indicated, the trial court here also instructed on aiding and abetting (CALJIC No. 3.02), as follows: "One who aids and abets another in the commission of a crime is not only guilty of that crime but is also guilty of any other crime committed by a principal *which is a natural and probable consequence* of the crime originally aided and abetted. [¶] In order to find the defendant in this case guilty under this principle of the crime of murder as charged in Count One or the lesser included crimes of attempted murder or manslaughter, you must be satisfied beyond a reasonable doubt that: [¶] . . . [¶] 1, the crime of assault with force likely to cause great bodily injury and/or the crime of robbery, was committed; 2, that the defendant aided and abetted the—that crime or crimes; 3, that a co-principal in that crime or crimes committed the crime of murder, attempted murder or manslaughter; and 4, that such crime *was a natural and probable consequence* of the commission of a crime of assault with force likely to produce great bodily injury and/or the crime of robbery. [¶] In determining whether a consequence is a natural and—is natural and probable, you must apply an objective test based not on what the defendant actually intended, but on what a person of reasonable and ordinary prudence would have expected likely to occur. The issue is to be decided in

---

[21] The fact that it could not be determined which precise blows to the head caused the victim's death, or which individual delivered each of those particular blows, of course does not itself relieve defendant of liability, so long as defendant participated in kicking the victim in the head. (See *People v. Sanchez* (2001) 26 Cal.4th 834, 844–849 [111 Cal.Rptr.2d 129, 29 P.3d 209].) Defendant does not challenge this on appeal, but rather contends that Johnson's acts were a supervening cause.

light of all of the circumstances surrounding the incident. [¶] *A 'natural' consequence is one which is within the normal range of outcomes that may be reasonably expected to occur if nothing unusual has intervened. [¶] 'Probable', means likely to happen. . . ."*[22] (Italics added.) This instruction further elucidated the requirement that the death of the victim had to be a natural and probable consequence, i.e., reasonably foreseeable, in order for defendant to be liable for his murder, and specifically defined the term "natural and probable consequence," including the concept that a natural consequence requires that "nothing unusual has intervened."

The jury was also instructed with CALJIC No. 6.11, which similarly provided that a member of a conspiracy is not only guilty of the crime the conspirators agreed to commit, but "is also liable for the natural and probable consequences of any [crime] or [act] of a co-conspirator done to further the object of the conspiracy, even though that [crime] or [act] was not intended as a part of the agreed upon objective and even though [he] . . . was not present at the time of the commission of that [crime] or [act]. [¶] . . . [¶] Again, [In determining whether a consequence is 'natural and probable' you must apply an objective test based not on what the defendant actually intended but on what a person of reasonable and ordinary prudence would have expected would be likely to occur. The issue is to be decided in light of all of the circumstances surrounding the incident. *A 'natural consequence' is one which is within the normal range of outcomes that may be reasonably expected to occur if nothing unusual has intervened. 'Probable' means likely to happen*]." (Italics added.) In this instruction the jurors received the definition of natural and probable once again, including the fact that a natural consequence must be within the normal range of outcomes that could reasonably be expected if nothing unusual intervened. One of the prosecutor's primary arguments to the jury was that defendant conspired with the young gang members to commit assault with force likely to cause great bodily injury to the victim, and that the victim's death was a natural and probable consequence of that conspiracy. Defense counsel argued below that the evidence did not support a finding that the victim's death was a natural and probable consequence of defendant's actions or that Johnson's actions were foreseeable. The instructions given, when considered as a whole, adequately conveyed the law of causation, and defense counsel was able to argue the issue to the jury.[23]

---

[22] The instruction referenced is taken from the reporter's transcript of the instruction as read to the jury by the court. The written instruction, with the judge's handwritten modifications, differs slightly from the reporter's transcript.

[23] *People v. Hansen* (1997) 59 Cal.App.4th 473, 481–482 [68 Cal.Rptr.2d 897] reached a similar conclusion where the defendant was charged with child endangerment for encouraging a minor to pull the trigger during a game of Russian roulette, finding that the instructions given (including CALJIC Nos. 3.40 and 3.41 regarding causation) were sufficient. The court stated

Further, if the standard civil instructions on a superseding intervening cause were given, it would not have benefitted defendant. Under CACI No. 432, for example, a superseding intervening act requires that "the kind of harm resulting from [the third party's] conduct was different from the kind of harm that could have been reasonably expected from [defendant]'s conduct." As indicated above, no reasonable jury would have found that death due to repeated blows to the victim's head was different from the kind of harm reasonably expected from the conduct defendant engaged in when he encouraged and joined in the initial beating of the victim, which included repeated blows to the head. Thus, any error in failing to give the clarifying instructions was "harmless under any standard because here it is clear beyond a reasonable doubt that a rational jury would have found defendant guilty absent any error. [Citation.]" (*Crew, supra,* 31 Cal.4th at p. 847.)[24]

■ Defendant additionally claims, perhaps to forestall a finding of waiver, that his trial counsel was ineffective for failing to request amplification regarding supervening cause, citing *Strickland v. Washington* (1984) 466 U.S. 668 [80 L.Ed.2d 674, 104 S.Ct. 2052] (*Strickland*). To establish that he was provided with ineffective assistance, a defendant must show both that counsel performed deficiently and that prejudice resulted—that it is reasonably probable he would have received a more favorable result had he received adequate representation. (*Strickland, supra,* 466 U.S. at pp. 687, 694; *People v. Lucas* (1995) 12 Cal.4th 415, 436–437 [48 Cal.Rptr.2d 525, 907 P.2d 373].) Absent a showing of prejudice, we need not consider whether counsel's performance was deficient in order to reject defendant's claim of error. (*Strickland, supra,* at p. 697.) As detailed above, under the facts of the present case, and given the instructions that were given to the jury, no prejudice resulted from defense counsel's failure to request amplification of the standard causation instruction. Defendant's ineffective assistance of counsel argument therefore fails.

B. *Instruction of Grand Jury.*

Defendant contends that the trial court erred in failing to dismiss the grand jury indictment pursuant to section 995, as the grand jury indicted him on less than probable cause because it was incorrectly instructed on proximate cause. We disagree.

---

that "these instructions and arguments [of counsel] fully informed the jury of the relevant law and properly framed the superseding cause issue . . . ."

[24] The jury was also instructed on the defense of withdrawal by an aider and abettor, and were thus told that if defendant notified the other principals known to him of his intention to withdraw from the commission of the crime and did everything in his power to prevent its commission, he should be found not guilty. (CALJIC No. 3.03.) The jury obviously rejected this defense. Defendant's reliance upon evidence that he told the young gang members, and possibly Johnson, not to kill the victim is therefore misplaced.

The Attorney General argues that the trial court's denial of defendant's motion pursuant to section 995 is not cognizable on appeal, as his motion to dismiss was not on the grounds he now raises on appeal and because he did not present this claim by way of pretrial writ. First, while defendant's section 995 motions were on grounds that included other arguments regarding the instructions the grand jury received, none advanced the primary argument he makes here—that the jury should have been instructed on supervening cause. Contrary to defendant's contention, nothing in the record indicates that it would have been futile to raise this particular instructional issue below, simply due to the court's rejection of his other arguments regarding the instructions given. Further, defendant has failed to make out a claim that his trial counsel's performance was deficient under *Strickland, supra,* 466 U.S. 668, because of his failure to raise this issue in his motions to dismiss, for the reasons indicated in the preceding section. Additionally, as the Attorney General notes, since the issue of instructional error is being raised for the first time on appeal, rather than by pretrial writ, we look to whether the evidence produced at trial supports defendant's conviction under the instructions given there and if his conviction was supported by sufficient evidence and the trial jury was properly instructed, defendant " ' " 'cannot be said to be prejudiced' " ' " (*People v. Crittenden* (1994) 9 Cal.4th 83, 136–137 [36 Cal.Rptr.2d 474, 885 P.2d 887]; see *People v. Cabrera* (2007) 152 Cal.App.4th 695, 701 [61 Cal.Rptr.3d 373]) and "the trial court's pretrial ruling is no longer subject to review" (*Cabrera, supra,* at p. 701).[25] For the reasons indicated elsewhere in this opinion, we find that defendant cannot make such a showing of prejudice from any alleged infirmity in the instructions given to the grand jury. However, even if the issue were cognizable on appeal, we would find defendant's argument to be without merit.

Defendant describes this argument as being "parallel to that made" above regarding the instructions given to his trial jury regarding proximate cause, that is, the jury was not instructed on supervening cause. The prosecutor read

---

[25] Defendant asserts that cases cited by the Attorney General in support of this position are all cases relating to preliminary hearing proceedings, not to indictments by a grand jury. While that assertion is true, we see no reason why the same rule would not equally attach to grand jury indictments when they are challenged on the grounds of the instructions given to the grand jury, and defendant has cited no authority to support his position that the reasoning of these cases does not apply. (See, e.g., *People v. Partlow* (1978) 84 Cal.App.3d 540, 555 [148 Cal.Rptr. 744] [insufficiency of evidence before the grand jury or at preliminary hearing may be reviewed by writ of prohibition under § 999a, but is subject to waiver].) As defendant notes, the court in *Cummiskey v. Superior Court* (1992) 3 Cal.4th 1018, 1022, footnote 1 [13 Cal.Rptr.2d 551, 839 P.2d 1059], found that such challenges are "tantamount to a claim that, as instructed, the jury may have indicted . . . on less than reasonable or probable cause." Defendant's reliance upon *People v. Brown* (1999) 75 Cal.App.4th 916, 929 [89 Cal.Rptr.2d 589] is unavailing as the court there only held that "A criminal defendant by virtue of his conviction has standing to challenge a discriminatory process of selecting grand jurors or grand jury forepersons. [Citation.]"

the following relevant instructions to the grand jury: CALJIC No. 3.00 (Principals—Defined); CALJIC No. 3.01 (Aiding and Abetting—Defined); CALJIC No. 3.02 (Principals—Liability for Natural and Probable Consequences); CALJIC No. 6.10 (Conspiracy and Overt Act—Defined); and CALJIC No. 6.11 (Conspiracy—Joint Responsibility). The sole eyewitness to testify before the grand jury, Danny G., indicated that the victim walked by defendant's house and called out a rival gang name, Danny pulled out a gun and defendant told him not to shoot and took the gun from him, the young gang members chased down the victim and beat him by punching and kicking him, defendant kicked the victim once in the stomach and once in the head, defendant then told the young gang members to go home and to let the victim get up, defendant went into his house and then into his backyard while the young gang members remained on defendant's front porch, and then Johnson arrived and led the second attack on the victim, stomping him with a milk crate and stabbing him.

Defendant cites to the following questions by the grand jury, and the answers given by the prosecutor, as supporting his argument that the grand jury was improperly instructed regarding causation:

(1) "A GRAND JUROR: . . . All the evidence that I have heard points to Neal Fiu being involved in the beating, but being absent during the stabbing. Have I missed something there, or is there something I'm overlooking or missed? [¶] THE PROSECUTOR: I can't say for a fact. You heard the same evidence I did . . . . [¶] [Y]ou do not have to be present at the time the crime is committed. [¶] You only have to agree that it should go forward, and one of the co-conspirators committed one of the overt acts."

(2) "A GRAND JUROR: If he is unaware that was the ultimate act someone else had in mind after he left, was he involved in that conspiracy? [¶] . . . [¶] Well, the person, it sounds like, came to do the stabbing, or did the stabbing, sounds to me like he showed up after Neal Fiu left. [¶] THE PROSECUTOR: Well, there are a couple of different versions, I believe, and so you'll have to decide what you think the facts are."

(3) "A GRAND JUROR: So because he was involved in the beating, even though his intention wasn't to kill him, he can still be held accountable as a co-conspirator for the murder, because later somebody else came in and stabbed him also. [¶] THE PROSECUTOR: If it was a natural and probable consequence which was foreseeable that somebody in the group may get out of hand and stab him."

(4) "A GRAND JUROR: His involvement qualifying him as being guilty of murder. Does his involvement qualify him as being guilty of the robbery if

he didn't take anything, even if he had left before the robbery took place—things like that. [¶] THE PROSECUTOR: Okay, and that's kind of a question for you. [¶] . . . [¶] Now, was the stabbing of him and the jumping up and down on his head a continuation on, was it an act in furtherance of the common design, which was to beat Salvador Espinosa [*sic*]? And if you find that, yes, that was and that is in fact what killed him, those things, then you can find that Neal is jointly responsible for those acts committed in furtherance of the conspiracy, and that they were part of the common design."

(5) "A GRAND JUROR: Even if he had left before those final acts started? [¶] THE PROSECUTOR: Well, this brings us back to the conspiracy."

(6) "A GRAND JUROR: If you conspire to beat someone up, but not to kill him, but he dies because somebody goes too far—. [¶] THE PROSECUTOR: There are two paths you can go down here. You can go down, first of all, the path of murder. Let's go out and kill Salvador Espinosa. [¶] . . . [¶] The issue is if you aid and abet somebody in a crime, you are guilty not only for what you aid and abet, but your agreement of another crime committed by the person you're aiding and abetting, which is a natural and probable consequence of the crime you originally started out on."

Defendant argues that these questions by the grand jurors amount to a request for instruction on an affirmative defense (supervening cause), and that the indictment should accordingly be dismissed, citing *Cummiskey v. Superior Court, supra*, 3 Cal.4th at page 1036 (defendant's § 995 motion should be granted if prosecutor misinstructs grand jury on necessary elements of crime or fails to instruct on defenses which, if believed, would result in no criminal liability). Defendant primarily relies upon his previous argument regarding the jury instructions on proximate cause and supervening cause that were given, or not given, to the petit jury to support this position. As explained *ante*, the CALJIC instructions that were given sufficiently addressed both of these issues and the grand jury did not have to receive a special instruction on supervening cause.[26] Defendant's motion to dismiss pursuant to section 995 was properly denied.

## C. *Instruction on Withdrawal.*

As to the charge of murder, one prosecution theory of liability that the trial court instructed on was aider and abettor liability. The trial court gave CALJIC

---

[26] Defendant additionally posits that, "Further, when the prosecutor answered the jury's questions as quoted above, he answered incorrectly, in part, when he conflated aiding and abetting principles and conspiracy principles." This argument was not developed any further. We reject claims that are not carefully enough developed to be discrete contentions; contentions "raised in such [a] perfunctory fashion [are] waived." (*People v. Harper* (2000) 82 Cal.App.4th 1413, 1419, fn. 4 [98 Cal.Rptr.2d 894]; see also *Tilbury Constructors, Inc. v. State Comp. Ins. Fund* (2006) 137 Cal.App.4th 466, 482 [40 Cal.Rptr.3d 392].)

No. 3.01, defining aiding and abetting: "A person aids and abets the [commission] [or] [attempted commission] of a crime when he or she: [¶] (1) With knowledge of the unlawful purpose of the perpetrator, and [¶] (2) With the intent or purpose of committing or encouraging or facilitating the commission of the crime, and [¶] (3) By act or advice aids, promotes, encourages or instigates the commission of the crime. [¶] [A person who aids and abets the [commission] [or] [attempted commission] of a crime need not be present at the scene of the crime.] [¶] [Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting.] [¶] [Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting.]" As previously indicated, the court additionally instructed on the liability of an aider and abettor for crimes other than those originally intended, with a modified CALJIC No. 3.02: "One who aids and abets [another] in the commission of a crime is not only guilty of [that crime] but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime originally aided and abetted. [¶] In order to find the defendant guilty under this principle of the crime of Murder, [as charged in Count one,] or the lesser included crimes of Attempted Murder or Manslaughter, you must be satisfied beyond a reasonable doubt . . . : [¶] 1. The crime of Assault With Force Likely to Cause Great Bodily Injury and/or the crime of Robbery [was] or were committed; [¶] 2. That the defendant aided and abetted [that] crime or crimes; [¶] 3. That a co-principal in that crime or crimes committed the crime of Murder, Attempted Murder or Manslaughter, and [¶] 4. Such crime [was] a natural and probable consequence of the commission of the crime of Assault With Force Likely to Cause Great Bodily Injury and/or the crime of Robbery. [¶] [In determining whether a consequence is 'natural and probable,' you must apply an objective test, based not on what the defendant actually intended, but on what a person of reasonable and ordinary prudence would have expected likely to occur. The issue is to be decided in light of all of the circumstances surrounding the incident. A 'natural' consequence is one which is within the normal range of outcomes that may be reasonably expected to occur if nothing unusual has intervened. 'Probable' means likely to happen.] [¶] [You are not required to unanimously agree as to which originally contemplated crime the defendant aided and abetted, so long as you are satisfied beyond a reasonable doubt and unanimously agree that the defendant aided and abetted the commission of an identified and defined target crime and that the crime of Murder, Attempted Murder, or Manslaughter was a natural and probable consequence of the commission of that target crime.]" As to defendant's liability for murder as an aider and abettor, the trial court instructed on the defense of withdrawal, pursuant to CALJIC No. 3.03. That instruction provided, "Before the commission of a crime, an aider and abettor may withdraw from participation in [that] crime, and thus avoid responsibility for [that] crime by doing two things: First, [he or she]

must notify the other principals known to [him or her] of [his or her] intention to withdraw from the commission of [that] crime; second [he or she] must do everything in [his or her] power to prevent its commission." Defendant contends that the court should further have instructed, sua sponte, on the allocation of the burden of proof on this defense.[27]

■ First, we note that defendant contends that "[b]ecause the trial court determined, and correctly so, that Appellant raised a reasonable doubt as to withdrawal, when it instructed on withdrawal, it should also have instructed that the burden of proof on withdrawal, or the lack thereof, was on the prosecution." In fact, by giving CALJIC No. 3.03 the court only determined that there was substantial evidence in the record supporting the defense, not that defendant had raised a reasonable doubt as to whether he effectively withdrew. (*People v. Panah* (2005) 35 Cal.4th 395, 484 [25 Cal.Rptr.3d 672, 107 P.3d 790] [trial court only required to give requested instruction on a defense if substantial evidence supports it].) A defendant has the burden of going forward (or initially producing evidence) that he both notified the other principals of his intent to withdraw and that he did everything in his power to prevent the commission of the crime, which then implicates the trial court's duty to instruct on the defense. Defendant met that burden here, as evidenced by the trial court's instructing on the defense of withdrawal. The issue remains, however, as to whether the court was required to specifically instruct on the burden of proof applicable to that defense.

■ The court must, of course, instruct on the general burden of proof in a criminal case, even without request; the burden never shifts to the defendant to prove that he is innocent. (*People v. Mower* (2002) 28 Cal.4th 457, 478–479 [122 Cal.Rptr.2d 326, 49 P.3d 1067] (*Mower*).) The trial court here properly instructed on that burden of proof by giving CALJIC No. 2.90. There are, however, a few specific affirmative defenses that a defendant bears the burden of proving by a preponderance of the evidence (such as insanity and defenses collateral to an element of the crime, such as entrapment). (*Mower, supra*, at pp. 479–481.)[28] As the court in *Mower* explained with regard to entrapment, the defense is not based upon the defendant's guilt or innocence and was developed to control illegal police conduct. (28 Cal.4th at p. 480.) The

---

[27] Defendant actually contends that CALJIC No. 3.03, as worded, improperly allocated the burden of proof to him, as it required that in order for the defense of withdrawal to apply, a defendant *must* notify the other principals of his intention and *must* do everything in his power to prevent the crime. We do not believe that this language in the standard instruction allocates the burden of proof, as opposed to stating what it is that the evidence must demonstrate (rather than who must demonstrate it and to what degree), in order for withdrawal to be effective.

[28] As the court in *Mower* indicates, those defenses amount to only "a handful," and include entrapment, momentary handling of a controlled substance for the sole purpose of disposal, and the "so-called defense of necessity against a charge of escape." (*Mower, supra*, 28 Cal.4th at p. 480 & fn. 8.)

defense of withdrawal does not fall within this "handful" of defenses that are collateral to the elements of the crime. Thus, in a case involving general liability as an aider and abettor for the originally contemplated crime, a defendant will not be liable for the contemplated crime despite the fact that he aided, promoted, encouraged, or instigated the commission of the crime with the intent that it be committed, if he effectively withdraws from participation in the crime before it is committed. In the present case, one of the prosecution's theories of defendant's liability for murder was that murder, although not the originally contemplated crime, was a natural and probable consequence of the originally contemplated crime or crimes, and that defendant was therefore liable for its commission. (CALJIC No. 3.02.) Under this theory of extended liability, a defendant will not be liable for crimes other than the contemplated crime, even though they are the natural and probable consequence of that crime, if he effectively withdrew before the commission of those offenses. In each of these circumstances, withdrawal goes to the issue of whether or not the defendant was a participant in the offense at the time it was committed, and is not collateral to the elements of the offense.[29] Withdrawal in this context is therefore not a defense upon which the defendant bears the burden of proof; it is rather a defense upon which the defendant has the burden of producing or going forward with evidence. Once a defendant has met that burden of production,[30] the prosecution bears the burden of proving beyond a reasonable doubt that the defendant did not effectively withdraw. Under these circumstances, whether or not a specific jury instruction must be given sua sponte allocating that burden of proof and if so, how the instruction should be worded, is an unsettled area of the law.

As a starting point, Evidence Code section 502 provides: "The court on all proper occasions shall instruct the jury as to which party bears the burden of proof on each issue and as to whether that burden requires that a party raise a reasonable doubt concerning the existence or nonexistence of a fact or that he establish the existence or nonexistence of a fact by a preponderance of the evidence, by clear and convincing proof, or by proof beyond a reasonable doubt." *Mower* held that section 502 did require sua sponte instruction on the allocation and weight of the burden of proof regarding the defense therein involved (a defense under the medical marijuana law), and held that the trial

---

[29] Both defendant and the Attorney General take the approach that withdrawal relates to a defendant's required specific intent to commit the target offense, when the theory of liability is as an aider and abettor. The defense of withdrawal is more aptly characterized as relating to whether or not the defendant was an active participant at the time the crime was committed, as reflected by the wording of CALJIC No. 3.03 itself: "Before *the commission* of a crime an aider and abettor may *withdraw from participation* . . . ." (Italics added.)

[30] That defendant here met that burden is demonstrated by the trial court's instruction upon withdrawal.

court there erred by instructing that the defendant had the burden of proving the defense by a preponderance of the evidence. (*Mower, supra,* 28 Cal.4th at pp. 483–484.)

The issue of the burden of proof on the defense of withdrawal most commonly arises in cases involving conspiracy liability. There is authority in that context holding that the requirement for instructing on the burden of proof regarding the defense of withdrawal is met by giving the general instruction on burden of proof (CALJIC No. 2.90) and properly instructing on the elements of withdrawal, and that "[t]he court ha[s] no duty to go beyond these general instructions and give pinpoint instructions sua sponte reiterating the burden of proof on each . . . defense[]." (*People v. Smith* (2005) 135 Cal.App.4th 914, 929 [38 Cal.Rptr.3d 1].) However, one case specifically dealing with withdrawal of an aider and abettor indicated that the court had a duty to instruct on the defendant's burden of proof as to the defense. The court resolved the issue of the trial court's failure to instruct on the burden of proof by determining that the defendant had not presented substantial evidence supporting a withdrawal defense at all. (*People v. Shelmire* (2005) 130 Cal.App.4th 1044, 1054–1055 [30 Cal.Rptr.3d 696].)

Defendant does not discuss the case authority specifically addressing instruction on the burden of proof in withdrawal situations, but relies instead upon CALCRIM No. 401 (Aiding and Abetting: Intended Crimes) as supporting his position that the jury should have been specifically instructed that the prosecution bore the burden of disproving that he withdrew. Unlike its counterpart, CALJIC No. 3.03, CALCRIM No. 401 does specifically allocate the burden of proof on the issue of withdrawal in a case involving aider and abettor liability. CALCRIM No. 401 provides in pertinent part, "The People have the burden of proving beyond a reasonable doubt that the defendant did not withdraw. If the People have not met this burden, you may not find the defendant guilty under an aiding and abetting theory." The Bench Notes to CALCRIM No. 401 provide no specific authority supporting this allocation of the burden of proof. Interestingly, CALCRIM No. 420 gives the trial court two alternatives for instructing on the burden of proof regarding the defense of withdrawal in conspiracy cases. One provides that the defendant has the burden of proof on the issue, by a preponderance of the evidence; the other provides that the People have the burden of disproving it, beyond a reasonable doubt. The bench note for this instruction states that there is "no authority" as to which of these two allocations of the burden of proof applies, although it indicates that the trial court must instruct as to the burden of proof and recommends reading *Mower, supra,* 28 Cal.4th 457. The Comment to CALJIC No. 6.20, the instruction on withdrawal from conspiracy, similarly indicates, "In the absence of definitive authority, the committee expresses no

opinion as to the defendant's burden of proof on the issue of withdrawal from a conspiracy"[31] and cites to Evidence Code sections 500 and 501 "for the general rule."

The Attorney General in the present case discusses little of the authority discussed by defendant and none of the cases discussed previously in this opinion, instead focusing on the general duties of instruction, seizing upon defendant's argument that the aider and abettor who withdraws lacks the specific intent necessary for aiding and abetting, and arguing that "[t]he instructions given placed squarely on the People the burden of proving this element." Therefore, the court had no duty to amplify the "long-standing instruction" on withdrawal by an aider and abettor. The Attorney General further contends that if it was error not to instruct upon the burden of proof on withdrawal, the error was harmless (without indication of which standard should be applied in this analysis), and concludes that because there was no evidence that defendant did anything to prevent further injury to the victim and because the prosecution did not suggest in argument that defendant bore the burden of proof on this defense, the lack of amplification did not prejudice defendant.

■ We believe that the trial court has a duty to instruct specifically on the allocation of the burden of proof on the defense of withdrawal; failing to do so sua sponte was error. The proper burden would be explained by the trial court indicating that if the jury has a reasonable doubt whether or not the defendant effectively withdrew, they should acquit. The error in failing to so instruct was, however, harmless here. Assuming that defendant is correct in his position that the standard of prejudice is harmless beyond a reasonable doubt (*Chapman, supra,* 386 U.S. 18), that standard was met in the current case. While defendant may have communicated to the young gang members an intent to withdraw from the initial attack and physically removed himself from the immediate area, he clearly did not do everything within his power to prevent further injury to the victim. He left the victim, unconscious from the beating that he and the young gang members had administered, on the ground around the corner from his house, at the mercy of the young gang members who had been drinking and who remained on defendant's front porch. At least one of those individuals had initially indicated a desire to kill the victim (which had earlier led defendant to take the individual's gun and suggest they beat the victim instead). When the attack on the victim started up again, after Johnson's arrival on the scene, defendant (according to at least one witness) did say to leave the victim alone. However, once again defendant took no other steps to prevent further injury to the victim—he obtained no medical assistance for the victim, did not assist him in leaving the area, did not try to

---

[31] The comment to CALJIC No. 3.03 (withdrawal as an aider and abettor) is silent on the issue of the burden of proof.

remove the young gang members from the area, and obviously did not summon law enforcement. No reasonable jury would have found defendant's actions to suffice for withdrawal and the error in failing to instruct on the burden of proof was harmless beyond a reasonable doubt.[32]

D. *Predicate Offenses for Gang Enhancements.*

 Gang enhancements were alleged, pursuant to section 186.22, subdivision (b) in count 1 (murder) and in count 2 (conspiracy). The crime of participation in a criminal street gang (§ 186.22, subd. (a)) was charged in count 3. Both the gang enhancements and the crime of gang participation require proof of participation in (§ 186.22, subd. (a)) or committing a crime for the benefit of (§ 186.22, subd. (b)) a criminal street gang. In order to qualify as a criminal street gang, the gang's members must "engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (a).) A pattern of criminal gang activity "means the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more" enumerated offenses. (§ 186.22, subd. (e).) The trial court took judicial notice of three prior offenses by the alleged SOD gang members, which the prosecution contended qualified as predicate offenses: (1) Salalee Vongsy's conviction of assault with a semiautomatic firearm (§ 245, subd. (b)) (crime occurred July 4, 2003, conviction on Jan. 13, 2004), (2) Deng Phtehlylei's conviction of assault with a semiautomatic firearm (§ 245, subd. (b)) (crime occurred Aug. 15, 1999, conviction on May 26, 2000), and (3) Chantha Duoangsy's conviction of possession of an assault weapon (§ 12280, subd. (b)) (crime occurred May 17, 2003, conviction on July 22, 2004). The trial court specifically instructed the jury that these three offenses alone[33] could be relied upon as the predicate offenses to establish the required pattern of criminal activity.

Defendant contends that the trial court erred in taking judicial notice of, and instructing the jury they could rely upon, Duoangsy's conviction of possession of an assault weapon (§ 12280, subd. (b)), as it is not an enumerated predicate offense. Respondent concedes that the trial court erred, as possession of an assault weapon is not an enumerated predicate offense, but contends that the error was harmless. We agree.

---

[32] Defendant relies upon the jury's deliberating for two full days as evidence that this was a close case. Excluding jury selection and jury deliberation, defendant's trial stretched over some nine to 10 days. Two days of deliberation is hardly noteworthy in its comparative length.

[33] The currently charged offenses may also be considered as predicate offenses (*People v. Loeun* (1997) 17 Cal.4th 1, 10 [69 Cal.Rptr.2d 776, 947 P.2d 1313] (*Loeun*); *People v. Gardeley* (1996) 14 Cal.4th 605, 624–626 [59 Cal.Rptr.2d 356, 927 P.2d 713]), but the trial court did not so instruct the jury.

█ Possession of an assault weapon, remarkably, is not an enumerated predicate offense listed in section 186.22, subdivision (e), even though possession of a concealable firearm by a minor (§ 12101, subd. (a)(1)), carrying a concealed firearm (§ 12025, subd. (a)), and carrying a loaded firearm (§ 12031) are enumerated. Hence the trial court erred in taking judicial notice of this offense and instructing the jury that it could be a predicate offense to establish a pattern of criminal activity. The error was, however, harmless. Section 186.22, subdivision (e) requires proof of only two enumerated offenses in order to prove a pattern of criminal gang activity. Disregarding the possession of an assault weapon conviction, the remaining two offenses that the trial court took judicial notice of, and instructed the jury regarding, provided the two necessary predicate offenses.

Section 186.22, subdivision (e) requires that the last of the predicate offenses must have occurred within three years after a prior offense.[34] The two convictions of assault with a semiautomatic firearm arose from crimes occurring on July 4, 2000, and August 15, 1999.[35] The last of the relied-upon predicate offenses thus occurred within three years of the prior offense. Defendant contends that the predicate offenses also had to be within three years of the current offense, citing *In re Lincoln J.* (1990) 223 Cal.App.3d 322 [272 Cal.Rptr. 852]. Defendant's reliance on *Lincoln J.* is misplaced. In *Lincoln J.*, the court determined that there was insufficient evidence of a pattern of criminal activity sufficient to demonstrate the existence of a criminal street gang, because no predicate offenses occurred within three years of the charged offense. (*Id.* at pp. 327–328.) However, in *Lincoln J.* the charged offense was one of the relied-upon predicate offenses; since there was insufficient evidence of another predicate offense within three years prior to that offense, the court found the evidence of a pattern of criminal activity was lacking. (*Ibid.*) The evidence here is distinguishable, as there were two offenses other than the charged offenses that were specifically relied upon as the only predicate crimes, and those met the requirement that the last occurred within three years of the former. Under these circumstances, nothing in section 186.22 requires that the predicate offenses have occurred within three years of the charged offense.

Defendant's concern that the lack of evidence that the last of the predicate offenses occurred within three years of the charged offenses results in a failure to demonstrate that the gang is an ongoing or continuing criminal

---

[34] It also requires that at least one of the predicate offenses must have occurred after the effective date of the section and that the offenses were committed on separate occasions, or by two or more persons. Defendant does not contend that these requirements were not met.

[35] Section 186.22, subdivision (e) requires proof of the commission of, or conviction of, two or more enumerated offenses. The temporal proximity requirement, however, specifically refers to "the last of those *offenses*" occurring "within three years after a prior *offense*." (Italics added.)

enterprise rather than an "off-again-on-again part-time organization" fails in the present case as the charged offenses themselves, standing alone, could have provided all of the requisite predicate crimes. As the court explained in *Loeun, supra*, 17 Cal.4th at page 10, "when the prosecution chooses to establish the requisite 'pattern' by evidence of 'two or more' predicate offenses committed on a single occasion by 'two or more persons,' it can, as here, rely on evidence of the defendant's commission of the charged offense and the contemporaneous commission of a second predicate offense by a fellow gang member."[36] Here, there were multiple qualifying offenses committed by defendant and multiple other gang members, arising from the charged offenses alone. There was no doubt this was an ongoing criminal enterprise.

Since the remaining offenses, properly instructed on as predicate offenses, met the definition of a pattern of criminal activity, the error in taking judicial notice of the possession of an assault weapon prior conviction and in instructing upon it, was harmless.[37]

E. *Consecutive Term for Street Gang Enhancement.*

The trial court sentenced defendant to a term of 15 years to life for his conviction of second degree murder (count 1), doubled to 30 years to life due to his prior strike. The court added an additional 10 years for the gang participation enhancement (§ 186.22, subd. (b)(1)(C)), for a total term of 40 years to life on this count.[38] Defendant contends that the addition of 10 years for the gang enhancement was error. Respondent concedes the trial court erred, and we agree.

---

[36] In *People v. Zermeno* (1999) 21 Cal.4th 927, 931–933 [89 Cal.Rptr.2d 863, 986 P.2d 196], the California Supreme Court distinguished another type of case in which the current offenses are relied upon as the only predicate offenses. In *Zermeno*, while the defendant assaulted the victim, an accomplice held off the victim's friends. (*Id.* at p. 929.) The accomplice's liability was as an aider and abettor only. Under those circumstances, the court held, there was only one offense committed and the conduct did not satisfy the statutory requirement of two or more predicate offenses. The court distinguished its prior holding in *Loeun, supra*, 17 Cal.4th 1, where the statutory requirement was met when the defendant and a fellow gang member each assaulted the victim (with different weapons) contemporaneously. (*Id.* at p. 6.) The two separate assaults by two different assailants in *Loeun* resulted in each perpetrator being subject to criminal liability as the perpetrator. (*Id.* at p. 5.) In the present case, there were (at the least) multiple assaults with force likely to produce great bodily injury by the various assailants and perhaps multiple robberies as well (by each of the individuals who removed the victim's clothing). Each perpetrator was liable for these crimes as a direct perpetrator. This case is therefore analogous to the *Loeun* case.

[37] Given this finding, defendant's contention that defense counsel's failure to object regarding these issues below constituted ineffective assistance of counsel is also without merit, as he has failed to demonstrate the required prejudice resulting from counsel's omission. (*Strickland, supra*, 466 U.S. 668.)

[38] The court stayed the sentences on counts 2 and 3, pursuant to section 654.

■ Section 186.22, subdivision (b)(1) provides for an enhancement if a defendant is convicted of a felony committed for the benefit of, at the direction of, or in association with, any criminal street gang (with the specific intent to promote, further, or assist in criminal conduct by gang members). If the felony is a violent felony, the enhancement is an additional 10 years in state prison. (§ 186.22, subd. (b)(1)(C).) However, if the defendant is convicted of a felony punishable by life imprisonment, the enhancement provides that the defendant shall not be paroled until a minimum of 15 years has been served. (§ 186.22, subd. (b)(5).) The determinate term enhancement provided for in subdivision (b)(1)(C) is to be applied only when the conviction is of a violent offense for which a *determinate term* is proscribed; if the conviction is of a crime for which an *indeterminate term* of life in prison is proscribed, the limitation upon parole eligibility provided for in subdivision (b)(5) is applicable. If the parole limitation of subdivision (b)(5) is applicable, the 10-year enhancement is not.[39] (*People v. Lopez* (2005) 34 Cal.4th 1002, 1007 [22 Cal.Rptr.3d 869, 103 P.3d 270].)

The trial court erred in imposing a 10-year enhancement pursuant to section 186.22, subdivision (b)(1)(C). Instead, the court should have imposed a limitation upon defendant's minimum parole eligibility of 15 years, pursuant to section 186.22, subdivision (b)(5), doubled to 30 years due to his prior strike conviction.

F. *Jury Selection.*

Defendant argues that the trial court erroneously denied his motion to dismiss the jury on the basis of the prosecutor's racially discriminatory use of peremptory challenges, thereby depriving him of a fair trial.

1. *Applicable law.*

■ A prosecutor may not use peremptory challenges to remove prospective jurors solely because they are members of an identifiable racial group. (*Batson v. Kentucky* (1986) 476 U.S. 79, 89 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258, 265–266, 272 [148 Cal.Rptr. 890, 583 P.2d 748].) Peremptory challenges must instead be exercised to eliminate a specific "bias relating to the particular case on trial or the parties or witnesses thereto." (*Wheeler, supra,* at p. 276.) To do otherwise violates a criminal defendant's federal constitutional right to equal protection

---

[39] As one court noted, this interpretation may result in less time being served than would the application of the 10-year enhancement, but the statute clearly makes this demarcation. (*People v. Harper* (2003) 109 Cal.App.4th 520, 527 [135 Cal.Rptr.2d 120].)

and his or her state constitutional right to be tried by a jury drawn from a representative cross-section of the community. (See *Batson, supra*, 476 U.S. at p. 89; *Wheeler, supra*, 22 Cal.3d at pp. 265–266, 272; *People v. Griffin* (2004) 33 Cal.4th 536, 553 [15 Cal.Rptr.3d 743, 93 P.3d 344]; see also U.S. Const., 14th Amend.; Cal. Const., art. I, § 16.)

*Batson* articulated a three-step process for evaluating a defendant's claim that the prosecutor's exercise of peremptory challenges was discriminatory. (*Batson, supra*, 476 U.S. at p. 96.) First, the defendant must make a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose on the part of the prosecutor. (*Johnson v. California* (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129, 125 S.Ct. 2410] (*Johnson*).)[40] We begin with the presumption that the prosecution exercised the peremptory challenge on a constitutionally permissible basis. (*People v. Cleveland* (2004) 32 Cal.4th 704, 732 [11 Cal.Rptr.3d 236, 86 P.3d 302].) The defendant bears the burden of producing evidence sufficient to permit the trial court to draw an inference that discrimination has occurred. (*Johnson, supra*, at p. 169.)

If the defendant makes a prima facie case of discrimination, the burden of proof shifts to the prosecutor at the second stage to show that the racial exclusion was not predicated on group bias. (*Johnson, supra*, 545 U.S. at p. 168.) The prosecution must offer a permissible race-neutral basis for exercising a peremptory challenge against that juror. (*Ibid.*)

Finally, if a race-neutral explanation is offered, the trial court must determine whether the opponent of the strike has proved purposeful racial discrimination. (*Johnson, supra*, 545 U.S. at p. 168.) In determining whether the prosecution's justification for peremptory challenge is pretextual, the proper focus of the trial court is on the subjective genuineness of the race-neutral reasons given, not on the objective reasonableness of those reasons. (*People v. Reynoso* (2003) 31 Cal.4th 903, 924 [3 Cal.Rptr.3d 769, 74 P.3d 852].)

We review the trial court's ruling on the question of purposeful racial discrimination for substantial evidence. (*People v. McDermott* (2002) 28 Cal.4th 946, 971 [123 Cal.Rptr.2d 654, 51 P.3d 874].) We give deference to the trial court's ability to distinguish "bona fide reasons from sham excuses." (*People v. Burgener* (2003) 29 Cal.4th 833, 864 [129 Cal.Rptr.2d 747, 62 P.3d 1].) The trial court's conclusions are entitled to deference as long as the court

---

[40] In *Johnson, supra*, 545 U.S. 162, 168, the United States Supreme Court reaffirmed that *Batson, supra*, 476 U.S. 79, states the procedure and standard to be used by trial courts when motions challenging peremptory strikes are made. (See *People v. Avila* (2006) 38 Cal.4th 491, 541 [43 Cal.Rptr.3d 1, 133 P.3d 1076].)

makes "a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered." (*Ibid.*)

### 2. *Peremptory Challenge of Prospective Juror I.R.*

In the present case, defendant argues that he was denied a fair trial because his jury was chosen in a racially discriminatory manner, based upon the prosecution's peremptory challenge of Prospective Juror I.R. We disagree.

We begin by setting out the facts as they arose at voir dire. Two members of the prospective jury panel were African-American.[41] The prosecutor challenged the first African-American juror questioned, I.R., for cause. After the trial court denied the challenge for cause, the prosecutor peremptorily challenged I.R. Defense counsel made a motion under *Batson, supra,* 476 U.S. 79, and *People v. Wheeler, supra,* 22 Cal.3d 258, alleging that the peremptory challenge was based upon I.R.'s race.[42] Specifically, defense counsel argued that I.R. showed no bias toward the defense, and was concerned only about the effect on her daughter of her absence due to jury duty. This, argued defense counsel, led to the inference that the prosecution based its peremptory challenge on race. The trial court found that the defense established a prima facie case that the prosecutor's peremptory challenge of I.R. was based upon group bias, after which the trial court directed the prosecutor to state any race-neutral reasons for his challenge. Having heard the prosecutor's reasons and the countervailing arguments of defense counsel, the trial court denied the *Batson-Wheeler* motion, allowing the peremptory challenge of I.R. to stand.[43]

The prosecutor offered the following reasons for the peremptory challenge of Prospective Juror I.R.:[44] "Now, she pointed out and took great pains to point out that she has the responsibility for a 16-year-old child at home. And then it turns out that this 16-year-old child is in school and then has activities after school. However, she's concerned about being away from the house while the child is at school, and she expressed that to the Court. And was—when [counsel for codefendant Johnson] and the Court attempted to rehabilitate her on that point, she said: Well, something could happen, and

---

[41] Defendant is Samoan, or Pacific Islander. Under *Powers v. Ohio* (1991) 499 U.S. 400, 409 [113 L.Ed.2d 411, 111 S.Ct. 1364], he had standing to object to the challenge of African-American jurors.

[42] At the time of the *Batson-Wheeler* motion, defendant's case was not yet severed from codefendant Johnson's case. The motion was brought by counsel for Johnson, with counsel for defendant joining in.

[43] Later, the second African-American prospective juror was excused for cause.

[44] Defendant outlines 11 "purported" reasons offered by the prosecutor in support of the peremptory challenge. We observe that the prosecutor offered three, and we confine our analysis to them.

I'm quite a ways. I'm in a different city. And the Judge said: Well, it's always possible something could happen. And at that moment she seized on the Judge's comment, your comment, as something in support of her argument, rather than being somewhat dismissive of it. [¶] Also she said that— [¶] THE COURT: On that issue though, what do you make of all that relative to her serving as a juror? [¶] [PROSECUTOR]: Well, it was a comprehension issue. She was not following the conversation. She didn't pick up on your cue: Well, of course it's possible something could happen. But I think the inference from the Court was: But it's very unlikely something is going to happen. Instead, she said: See, it really could happen. And I would be here, and she would be in Richmond. [¶] Now I don't think most people have that kind of hesitation about a 16-year-old being at school, and having to wait at home just in case there's a telephone call. So, I wondered: Is she really up to this? Number one. [¶] Number two, she said it would be harder to make a decision with them in the room, because she is going to have to look at the person behind it, rather than base her verdict solely on the facts. [¶] Thirdly, [counsel for codefendant] did bring up the issue of race with her and pointed out to everybody on the jury there were only two people of African American heritage in the room, and he needed to make sure that things were gonna be fair. And she became somewhat irritable in response to his inquiry, and she says: Now, back to you. And she laid into him that it doesn't matter whether the person is [B]lack, [W]hite, yellow, brown, or whatever, if they did the crime they are gonna go to jail. And in that situation I wondered: Is she going to react to something I do quickly or harshly? [¶] She appeared to me to be not up to the complexity of the case. She appeared to be very worried about other issues, specifically her 16-year-old daughter who she spoke very highly of. Her worries there seem to be somewhat misplaced. And I put her in the category of [N.D., I.R., A.J.], in terms of who—all of whom I plan on issuing challenges, that I'm not confident that she can come back with a verdict of guilty, even if it's proven beyond a reasonable doubt."

The trial court ruled on the peremptory challenge of I.R. as follows: "THE COURT: I believe [the prosecutor] in good faith has exercised the peremptory challenge for race neutral reasons. He—in particular what persuades me of that is her statement that she would—suggesting that she would somehow be influenced in her decision by the fact that the person is here looking at her. Not necessarily that she's scared, but that the existence of a real individual here would—present might have an influence on her decision which sug- gests—understandably so, suggests that she might be influenced by consider- ations for the defendant, sympathy for the defendant, in arriving at her verdict. That seems to me a legitimate prosecutorial concern that I think has been voiced by [the prosecutor] in good faith. [¶] And the other reasons he gave, although I might disagree with them or defense might disagree with them, appear to me to have been voiced in good faith and for race neutral

reasons. Therefore, if you did exercise a challenge in this matter and there were a <u>Batson-Wheeler</u> motion brought,[45] it would be deemed considered and denied for all the reasons we have articulated on the record." (Original underscoring.)

### 3. *Evaluation of Trial Court's Ruling.*

So long as the trial court made a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, then we defer to the trial court's ability to distinguish bona fide reasons from sham excuses. (*People v. Avila, supra,* 38 Cal.4th at p. 541.) Substantial evidence exists in the record supporting the trial court's finding that the prosecutor's reasons for the peremptory challenge of Prospective Juror I.R. were genuine.

The trial court focused primarily on the prosecutor's second reason for excusing I.R.—the impact of the defendants' being in the courtroom—as a race-neutral reason for the peremptory challenge of I.R. The prosecutor based this reason for his peremptory challenge on I.R.'s statement that the presence of defendant in the courtroom would make it more difficult for her to make a decision regarding guilt. On both her jury questionnaire and during oral voir dire, she gave responses consistent with the prosecutor's justification, indicating that it would be difficult for her to arrive at a verdict after being in the presence of the defendants. On her jury voir dire questionnaire, I.R. answered affirmatively to the question asking whether she had "moral, religious, or other principles which would make it difficult to determine whether someone is guilty or not guilty of a crime." During her examination by the trial court, the following ensued: "[THE COURT]: Now, there's a question here that says: Do you have moral, religious or other principles which would make it difficult to determine whether someone is guilty or not guilty of a crime? And you answered that yes. [¶] What did you have in mind? [¶] A. Just it's kind of hard for me to make a decision like this, you know. [¶] Q. Is it— [¶] A. I can—I can make it without seeing the person, you know, but you know, it's just— [¶] Q. In this case, you have Mr. Fui [*sic*]. You have Mr. Johnson. [¶] A. Um-hum. [¶] Q. You are going to see them. They are going to see you? [¶] A. I know. [¶] Q. Can you make the decision under those circumstances? [¶] A. I probably could, but it would be a little hard for me. [¶] Q. Hard. Okay. I understand that. For any number of reasons, making a decision such as this may be hard on any given individual. I can appreciate that. But what I am ultimately trying to get to is, even though it may be hard, can you do it, and do it in the way we said the law requires? [¶] A. I could do

---

[45] When the trial court denied the prosecution's challenge of I.R. for cause, it was indicated (outside the presence of the jury) that a peremptory challenge would be made by the People, and that defense counsel would make a *Batson-Wheeler* motion. The court therefore proceeded with the motion, in anticipation of the prosecutor's peremptory challenge of I.R.

it in a way that it would, you know, whatever the case outcome would be, I could do whatever need be done." In response to the prosecutor's questions about the impact of the defendants' presence in the courtroom, I.R. added, "They, you know, you look them in the eye, you see them. You see a person. You see, you know, human beings sitting there, you know. Hanging onto a decision you would make, you know. With they [*sic*] life, with what, you know, whatever happens."

 Substantial evidence supports this proffered reason for the peremptory challenge of Prospective Juror I.R. Based upon these responses by I.R., the prosecutor initially challenged I.R. for cause. The trial court denied the prosecution's challenge for cause, concluding that I.R. would not "be influenced by defendant's presence and arriving at her verdict." However, the prosecutor's justification for a peremptory challenge "need not support a challenge for cause." (*People v. Allen* (2004) 115 Cal.App.4th 542, 547 [9 Cal.Rptr.3d 374], citing *People v. Arias* (1996) 13 Cal.4th 92, 136 [51 Cal.Rptr.2d 770, 913 P.2d 980].) So long as the prosecutor's reason, even if " ' "trivial," ' " was " 'genuine and neutral,' " it will suffice. (*Allen, supra,* at p. 547.) I.R. expressly indicated on the questionnaire that she had doubts as to her ability to render a verdict, bolstering a valid race-neutral prosecutorial concern. The prosecutor was likewise not comfortable with the tenuous nature of I.R.'s responses regarding making decisions when "look[ing] them in the eye." We agree with the trial court's conclusion that this indicated reason for the prosecutor's peremptory challenge was race neutral.

Defendant further argues that a comparative analysis of this proffered reason for challenging I.R. (her reluctance due to the defendants' presence in the courtroom) with the prosecutor's lack of challenge of similarly situated White jurors demonstrates that the challenge of I.R. was not race neutral. Relying on *Miller-El v. Dretke* (2005) 545 U.S. 231 [162 L.Ed.2d 196, 125 S.Ct. 2317] (*Miller-El*), defendant contends that a White juror, Juror No. 12, made a comment "similar to that of [I.R.]," thereby establishing that the peremptory challenge was pretextual. Significant factors distinguish *Miller-El* from the present case. In *Miller-El*, the Supreme Court concluded that an aggregate of circumstances supported the conclusion that the prosecutors had selected and dismissed jurors on the basis of race. (*Id.* at pp. 265–266.) Specifically, the *Miller-El* prosecutors had dismissed an overwhelming majority of eligible African-American venire persons, had used trick questions, directed only at the African-Americans, designed to elicit challengeable responses, and engaged in "jury shuffling" to avoid seating African-American jurors. (*Ibid.*) The analogy with the instant case fails. We find nothing in the record supporting the conclusion that the prosecutor

engaged in purposeful discrimination or that the trial court erred in finding the prosecutor's explanations not to be race based.

The comparative juror analysis suggested by defendant leads to the same conclusion.[46] During voir dire, Juror No. 12 stated that sitting on a jury with gang allegations would be "nerve wracking," but not impossible to endure. Defendant contends that the degree of Juror No. 12's emotional difficulty exceeded that of Prospective Juror I.R., who merely stated it would be "harder" at trial than at the grand jury. However, Juror No. 12 apparently did not react harshly to questioning and had no childcare concerns. We observe as well that I.R. and Juror No. 12 were commenting on two different topics—being in the presence of the defendants in the case of I.R., and the ramifications of considering gang violence in the case of Juror No. 12. This comparison of words in isolation fails as a basis for establishing that the prosecutor's reason was pretextual.

Defendant claims that the prosecutor ascribed to I.R. the statement that she would not " 'base her verdict solely on the facts,' " because of defendant's presence in the courtroom, and that this statement is not supported by the record, rendering it pretextual. (See *People v. Silva* (2001) 25 Cal.4th 345, 385 [106 Cal.Rptr.2d 93, 21 P.3d 769].) From the record, it does not appear that the prosecutor was attempting to quote I.R. verbatim on this matter. A valid inference is that he was expanding upon the juror's prior statement to the trial court that "it's kind of hard for me to make a decision like this" while "seeing the person." As such, the claim that the prosecutor's reason was not supported by the record, rendering it not race neutral, lacks merit. Defendant also argues that the prosecutor's statement that I.R. was " 'worried about being in the same room as the defendant' " is not supported by the record. In fact, the record shows that the prosecutor used these words during his challenge for cause,[47] not as a reason supporting the peremptory challenge, where he stated that I.R. "said it would be harder to make a decision with [the defendants] in the room." We are unpersuaded in this instance by defendant's *Silva* argument.[48] (25 Cal.4th at p. 385.)

---

[46] The issue of whether an appellate court must conduct such a comparative analysis in the first instance has now been resolved by the California Supreme Court in *People v. Lenix* (2008) 44 Cal.4th 602. The court in *Lenix* held that such a comparative analysis must be performed. In *Snyder v. Louisiana* (2008) 552 U.S. ___ [170 L.Ed.2d 175, 128 S.Ct. 1203] the United States Supreme Court, without an express ruling on the issue, had also applied a comparative analysis, albeit with caveats regarding use of the "cold appellate record." (*Snyder, supra,* at p. ___ [128 S.Ct. at p. 1211].)

[47] As noted *ante,* the People's challenge for cause was denied.

[48] Similarly, defendant argues that the prosecutor inaccurately ascribes to I.R. the statement that the presence of defendant at trial would put added "pressure" on her. The prosecutor offered this statement during his argument supporting challenge for cause, not in support of his

Defendant cites *People v. Fuentes* (1991) 54 Cal.3d 707, 720 [286 Cal.Rptr. 792, 818 P.2d 75] for the proposition that " 'the trial court must determine not only that a valid reason existed, but also that the reason actually prompted the prosecutor's exercise of the particular peremptory challenge.' " Defendant contends that the trial court erred by concluding that the prosecutor challenged Prospective Juror I.R. "because, supposedly, she would be 'sympathetic' to [defendant], because she would see him in the courtroom." This alleged mischaracterization by the trial court of the prosecutor's reasoning demonstrates, according to defendant, that the trial court erred by putting into the prosecutor's mouth a reason that he never gave. We are not persuaded that the trial court's use of the word "sympathetic" so misrepresents the prosecutor's reason as to render the ruling erroneous. The prosecutor's actual words, "she said it would be harder to make a decision with them in the room, because she is going to have to look at the person behind it," do not differ materially from the wording of the trial court's evaluation. We conclude, therefore, that, notwithstanding the change in wording, the trial court's evaluation of the reasons presented by the prosecutor was sincere and reasoned.

The trial court also found the prosecutor's other two reasons for peremptorily challenging I.R. to be race neutral, indicating that although it "might disagree with [the reasons]," the court found them "to have been voiced in good faith and for race-neutral reasons."[49] The prosecutor's first reason, that I.R. might not be "up to" the complexity of the case, was based primarily on I.R.'s failure to respond appropriately to the trial court's cues regarding the small likelihood that something negative would befall her 16-year-old daughter while I.R. was serving on the jury.[50] During voir dire, I.R. repeatedly told the court and counsel about her concerns regarding being away

peremptory challenge. Defendant's allegation that the prosecutor's explanation was pretextual because it was not supported by the record again lacks merit. (*People v. Silva, supra*, 25 Cal.4th at p. 385.)

[49] Prospective Juror I.R.'s persistent referencing back to her concern for her daughter, as well as her apparently unjustified outburst at defense counsel, convince this court that the prosecutor's other two reasons were sincere and not race based. Defendant alleges, in the alternative, that the prosecutor's numerous reasons, only some of which might be race neutral, demonstrated a mixed motive for the peremptory challenge. Applying an equal protection rationale, defendant argues that mixed-motive analysis shifts the burden onto the prosecutor to show that the challenge would have been made even absent the race-based motivation. Insofar as we are not persuaded that any of the three reasons proffered by the prosecution were race based, this argument is moot.

[50] Defendant contends that the prosecutor's claimed reason that Prospective Juror I.R. " 'was not up to the complexity of the case,' " is not supported by the record, in that I.R. had previously served "satisfactorily" on a San Francisco grand jury. (See *People v. Silva, supra*, 25 Cal.4th at p. 385 [prosecutor's reason for the challenge cannot be race neutral where it is unsupported by the record].) The record, however, does not reflect anything about I.R.'s grand jury duty other than the fact that I.R. affirmed that she understood the distinction between a grand jury and a trial jury. There is no indication of the complexity of the case or cases I.R. sat

from home while her 16-year-old daughter was at school. I.R. lived in Richmond with her daughter, and the trial took place in Martinez. I.R. expressed concern that if something happened to her daughter during the time I.R. was at the courthouse, she would not be able to receive a message or respond quickly enough. Defendant asserts that the prosecutor's first reason lacked a logical, nonracial basis, that I.R.'s overprotectiveness and family values would in fact make her a more desirable juror from the prosecution's viewpoint, and therefore challenging her on this basis could be only racially motivated. We are unpersuaded. The prosecutor's reason raised a valid prosecutorial concern, both due to I.R.'s failure to comprehend what the trial court was intimating during its exchange with I.R. regarding this issue, and also due to her distraction by her disproportionate concern regarding her daughter.[51] Substantial evidence supports the trial court's ruling regarding this proffered reason for the prosecution's excusal of Prospective Juror I.R. In *People v. Reynoso, supra*, 31 Cal.4th 903, 924, our Supreme Court reinforced that the "proper focus of a *Batson/Wheeler* inquiry, of course, is on the subjective *genuineness* of the race-neutral reasons given for the peremptory challenge, *not* on the objective *reasonableness* of those reasons" (original italics, citing *Purkett v. Elem* (1995) 514 U.S. 765, 769 [131 L.Ed.2d 834, 115 S.Ct. 1769]). In *Reynoso*, the successful peremptory challenge of a Hispanic potential juror in a complex murder case was based in part on her occupation in customer service as well as her inattentiveness at voir dire. *Reynoso* is not inapposite to the instant case. Just as the prosecutor in *Reynoso* could reason in sincerity that the potential juror was not up to the task of being a juror, so could the prosecutor here legitimately reason that I.R. was not up to the complexity of the case, "in the sense that it would not deny defendants equal protection of law." (*Reynoso, supra*, 31 Cal.4th 903, 925.)

The prosecutor offered as a third reason supporting the peremptory challenge the fact that he was concerned Prospective Juror I.R. would react harshly or precipitously to some aspect of the prosecution's case. This reason was based on the prosecutor's observation that I.R. had, without apparent provocation, "laid into" codefendant's counsel on the topic of race. "A prospective juror may be excused based upon bare looks and gestures,

---

on while a member of the grand jury. Thus, defendant's argument allegedly refuting the prosecutor's reason is itself not supported by the record.

[51] Defendant argues also that the prosecutor's proffered reason that I.R. was not "up to" the case was unsupported by the record, which he alleged demonstrated that I.R. "followed the judge's questions perfectly." (See *People v. Silva, supra*, 25 Cal.4th at p. 385.) Although I.R. responded to the trial court's yes-or-no questions, the record supports the inference that she was not always tracking the point of the trial court's comments. For example, when the judge interjected a rehabilitative comment into the voir dire by counsel for codefendant, I.R. failed to grasp that the trial court was actually offering a reasonable solution to her concerns about her daughter.

hunches, and even arbitrary reasons." (*People v. Allen, supra*, 115 Cal.App.4th at p. 547; see *People v. Turner* (1994) 8 Cal.4th 137, 170 [32 Cal.Rptr.2d 762, 878 P.2d 521] [peremptory challenge upheld where juror's body language seemed angry and hostile].) Although defendant argues that I.R.'s irritation at counsel for codefendant should have suggested to the prosecutor that I.R. was proprosecution, implying that the peremptory challenge was therefore race based, the prosecutor aptly pointed out that I.R.'s irritability could just as easily turn against the prosecutor himself or against other jurors.[52] Substantial evidence supports the trial court's determination that this reason for excusing I.R. was also race neutral.

### 4. *Conclusion.*

█ Even a brief reference to the prosecutor's reasons and the trial court's own observations of the challenged jurors can constitute a sincere and reasoned evaluation of the credibility of the prosecutor's justifications. (*People v. Jackson* (1996) 13 Cal.4th 1164, 1197–1198 [56 Cal.Rptr.2d 49, 920 P.2d 1254]; *People v. Montiel* (1993) 5 Cal.4th 877, 909 [21 Cal.Rptr.2d 705, 855 P.2d 1277].) Deference is shown to the trial court's evaluation of the reasons given in support of peremptory challenges. The trial court must consider all relevant circumstances as well as circumstances that are subtle, subjective, and incapable of being transcribed. (*People v. Jackson, supra*, 13 Cal.4th at p. 1197.) When the prosecutor's reasons are inherently plausible and supported by the record, then the trial court need not question the prosecutor or make detailed findings. (*People v. McDermott, supra*, 28 Cal.4th 946 at p. 980; *People v. Silva, supra*, 25 Cal.4th at p. 386.) In the present case, the trial court considered the prosecutor's reliance on Prospective Juror I.R.'s tenuous responses about rendering verdicts in the presence of the defendants, her insistence on the need to be at home for her 16-year-old daughter, along with her questionable ability to handle the complexity of the case and her apparent volatility during voir dire. We conclude that the trial court's findings that the prosecutor's reasons were not pretextual was supported by substantial evidence. The trial court did not err in denying defendant's *Batson-Wheeler* motion.

---

[52] Defendant argues that the comments precipitating I.R.'s outburst were mischaracterized by the prosecutor as having been made by defense counsel, and therefore *Silva* controls. (*People v. Silva, supra*, 25 Cal.4th at p. 385.) Codefendant's counsel spoke at length about race to the seated jury panel just prior to individual voir dire. Although the prosecutor did describe the timing of defense counsel's race-related comments somewhat inaccurately, this inaccuracy does not invalidate the reason given by the prosecutor—i.e., that I.R. might react inappropriately during trial or during jury deliberations.

## DISPOSITION

The 10-year enhancement imposed on count 1 pursuant to section 186.22, subdivision (b)(1)(C), is ordered stricken and a minimum parole eligibility of 30 years shall be imposed on that count. The abstract of judgment shall be modified to reflect a sentence on count 1 of 30 years to life, with a minimum parole eligibility of 30 years, and the modified abstract shall be forwarded to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

Ruvolo, P. J., and Reardon, J., concurred.

A petition for a rehearing was denied August 20, 2008, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied October 28, 2008, S166501.