Filed 9/23/20  P. v. Archuleta CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E072903 |
| v. | (Super.Ct.No. INF1700972) |
| ORLANDO ARCHULETA, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. James S. Hawkins, Judge. Affirmed as modified.

Kimberly J. Grove, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Allison V. Acosta and Kristine A. Gutierrez, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Orlando Archuleta of second degree murder after hearing evidence the victim was fatally shot when Archuleta and his cohort confronted him in retaliation for a friend's death. Though the prosecution argued Archuleta was the shooter and had committed first degree murder, the jury rejected this theory, finding him not guilty of first degree murder and finding the allegation he discharged a firearm not true. The trial court sentenced Archuleta to 30 years to life for the murder plus two years for two prior prison terms. (Pen. Code, § 667.5, subd. (b); unlabeled statutory citations refer to this code.)

On appeal, Archuleta argues the trial court erred by instructing the jury on contrived self-defense (CALCRIM No. 3472) and consciousness of guilt (CALCRIM Nos. 362, 371, 372). He also argues the prison prior enhancements are unauthorized under recently enacted Senate Bill No. 136 (2019-2020 Reg. Sess.) (Stats 2019, ch. 590, § 1) (S.B. 136). On this point he is correct, but we reject his claims of instructional error. As we explain below, the challenged instructions correctly state the law and did not prejudice Archuleta's defense. We therefore modify his sentence to strike the prison prior enhancements, but affirm the judgment in all other respects.

# I

## FACTS

Around 8:30 in the evening on March 29, 2017, the police responded to a call reporting multiple gun shots fired at J.N.'s apartment in Desert Hot Springs. Dispatch advised the officers that neighbors had heard several gunshots and someone saw a vehicle

speeding away from the area. Upon their arrival, the officers noticed drops of blood and several shell casings on the ground near the side of the apartment. The officers found the victim, later identified as Jose Vargas, dead inside the one-room apartment, surrounded by more ammunition (both live rounds and shells). An autopsy determined Vargas had been shot six times and had entry wounds on the front and back of his body. A sample taken from the blood outside the apartment matched Archuleta's DNA.

The police interviewed several people who had been hanging out at J.N.'s apartment that evening. Among those present, in addition to Vargas, were Gilbert, Sophie, Tiffany, and J.N.'s girlfriend Destiny. Sophie told the police that while they were hanging out five Hispanic males arrived and three of them "rushed" through the apartment door, looking "agitated." Both Sophie and J.N. identified Archuleta (whose nickname is "Nanos") from a photographic lineup as one of the men who came into the apartment, and J.N. identified Danny Noriega (also known as "Danny Boy") as one of the men with Archuleta. Sophie said one of the men who had entered told the women to leave, so she went outside and soon after heard multiple gun shots from inside the apartment.

J.N. said Archuleta and Noriega were there to ask about guns they claimed belonged to a man named Freddy Morales, who had been killed two days earlier. J.N. denied seeing anything concrete, but said he heard someone ask, "What's up with your strap?" (meaning gun), after which he saw multiple muzzle flashes from where Archuleta and Danny were standing, followed by flashes from where Gilbert was standing.

3

Tiffany was outside J.N.'s apartment when the shooting occurred. She told the police she had arrived just as an argument was starting inside the apartment and heard some people telling others to get out. While outside she spoke to two of Archuleta's brothers, Patrick and Johnny, and heard them yell towards the apartment, "Nanos. Danny Boy. You guys cool?" She could hear the people inside arguing about Freddy and a gun. The brothers then walked towards the apartment door, but she didn't see if they went inside because her view was blocked. She heard a scuffle and the firing of several gun shots from what sounded like two different guns. People immediately began fleeing from the apartment, and she saw Nanos limping away in the crowd as if he'd been injured. Throughout her interview, she kept telling the police that Vargas had been set up and it was actually a person who went by the name "Wanted" who had killed Freddy.

During his police interview, Noriega denied being inside J.N.'s apartment at the time of the shooting but said he had seen Archuleta there and heard gunshots.

Every witness the police interviewed denied seeing any guns that night. The most anyone could say is that they'd heard gunshots.

Archuleta's ex-girlfriend, Erica, testified against Archuleta at trial. At the time of the incident, she had been dating him for about five months and was living with him. On March 27, two days before Vargas was shot, Noriega came over to Archuleta's house to report that Freddy Morales had been murdered. Erica had been close friends with Freddy and had introduced Archuleta to him. On the day of the incident, Noriega stopped by Archuleta's house before going to Freddy's memorial, and Archuleta and his brother

4

Patrick decided to go with him. About 30 minutes later, Erica called Archuleta to check on him. He said he was still at the memorial and would call her back later. When he called about 15 minutes later, he said he was in the car with Noriega and had gotten tied up with something. He said he was on his way to talk to somebody and would call her later.

After that Erica called Archuleta several times before he finally picked up. When she asked where he was, he told her to hold on, and she could hear him talking to someone. She then heard Noriega say, "[H]e doesn't live there. He lives over here." Archuleta told Erica they were going to "E-Man's" house, but he didn't hang up the phone. Erica listened for about 10 minutes before asking what he was doing, at which point he responded, "Oh, shit," and hung up the phone. Erica called him several more times before he eventually picked up and told her he was "trying to handle something really quick." He said they had just arrived at J.N.'s apartment and were trying to find out what had happened to Freddy's guns after he died. He told her they had thought the guns were with E-Man, but E-Man just told them he didn't have them anymore, Vargas did.

Uncomfortable with the situation, Erica called Archuleta again, and when the call connected, she could hear Vargas (whom she knew) say, "No, fool. I'm not going to give it to you." Erica said hello several times, trying to get Archuleta's attention, then the call disconnected.

About 15 minutes later, Archuleta came back to the house covered in blood and holding his elbow. His other brother, Derrick, took him and Erica to the emergency room. When Erica was alone with Archuleta in the treatment room, he told her Vargas's friend Gilbert had shot him because he had been arguing with Vargas about Freddy's guns.

According to Erica, she figured Archuleta was the victim at this point because he hadn't mentioned what had happened to Vargas. And so she and Archuleta decided to lie to the officer who interviewed them at the hospital, to "take the heat off" of them. They said Archuleta had been shot near a theater in Rancho Mirage, trying to protect Erica from being robbed of her purse. The police tested Archuleta's and Erica's hands for gunshot residue and both tests came back negative.

Archuleta had surgery the next morning and Erica learned from the news that Vargas had died. While Archuleta was recovering, she pressed him about what really had happened at J.N.'s apartment. After some time, he reluctantly divulged details. He told her they had gone to J.N.'s looking for Vargas because they thought he had murdered Freddy and taken his guns. Archuleta was armed with a nine-millimeter Ruger semiautomatic. When he arrived, he asked the others to leave the apartment because he needed to talk to Vargas. At that point, he received a FaceTime call from Freddy's older brother, Jonabeth. He told Jonabeth he was with Vargas trying to solve the mystery of the guns and Jonabeth asked Archuleta to "let me see." Archuleta panned his phone across the room, then told Jonabeth he would call him back. Right after he hung up, Jonabeth sent him a Facebook message saying, "Finish him."

6

According to Erica, Archuleta told her that he and Vargas started to "struggle." He put Vargas into a headlock then saw him reaching for a gun so he shot him. He told Erica he shot Vargas twice and he fell to the ground. Then he emptied his clip into Vargas, shooting him a few more times. He told her, "That fool is not getting up. I dumped on him." That evening, Erica contacted the police and reported what Archuleta had told her.

Erica also showed the police the conversation she'd had with Jonabeth, who was in prison, over Facebook. She told Jonabeth that Vargas had died and Archuleta had been "busted." She asked him where he had gotten the idea that Vargas had killed Freddy because he was wrong. She also said, "Nanos said to let you know not to talk to no one about this, for you to act like you don't know [Vargas] is gone." She said Archuleta was going to "finish business when he gets out" and was "going after Wanted as soon as he gets home." At trial, she explained that Wanted had also been suspected of killing Freddy.

During closing argument, the prosecution argued the evidence proved beyond a reasonable doubt that Archuleta had committed first degree murder. He argued the evidence proved Archuleta had gone to J.N.'s apartment armed with a gun for the purpose of killing Vargas in retaliation for Freddy's murder and so he could retrieve Freddy's guns. He also argued that Archuleta could not claim he shot Vargas in self-defense because Archuleta had intentionally created (or contrived) any need on Vargas's part to use violence by his act of assaulting him with a gun.

Anticipating the defense theory of the case, the prosecutor addressed the issue of Noriega and Patrick, who by all accounts had accompanied Archuleta to the apartment. "Now, this is where the defense, I think, is going to focus. There is evidence that shows another person did this. The evidence shows another person may have been involved in the commission of the crime as charged against the defendant. There have been many reasons why someone who appears to [] have been involved might not be a codefendant in this particular trial. You must not speculate about whether that other person has been or will be prosecuted. Your sole duty is to decide whether [Archuleta] . . . committed the crime as charged."

The prosecutor argued that even if the jury found that Noriega or Patrick had shot Vargas, Archuleta was guilty as an accomplice. "Even if you believe Danny Noriega or Patrick Archuleta were shooting, it doesn't absolve [Archuleta] of his responsibility. There is an instruction in the law called aiding and abetting." The prosecutor argued the jury could convict Archuleta of first or second degree murder under an aiding and abetting theory because there was evidence Archuleta knew his friends intended to kill Vargas (because they all suspected him of having killed Freddy and taking his guns) and there was evidence Archuleta helped them do it. "They three seem to be standing by the door surrounding [Vargas] based on the sketch of [J.N.]. The defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime. Telling people to leave—surrounding that seems to be aiding and abetting an execution of someone who is shot six times."

According to defense counsel's closing statements, Archuleta's theory of the case was indeed that Noriega, Patrick, or someone else had been the shooter. Focusing on the dearth of eyewitness testimony and the fact no one could say they saw Archuleta carry or fire a gun, defense counsel argued the People had not proved his client killed Vargas. He also pointed to what he viewed as holes in the prosecution's investigation—that videos of witness interviews had gone missing and the police had failed to perform gunshot residue tests on Archuleta's clothes when they had the opportunity at the hospital. Finally, he argued Erica was "a liar" who had a motive to help the prosecution to protect herself from liability for giving false statements to the police. He argued her story that Archuleta told her he shot Vargas in self-defense was fabricated and false. "[My client] is saying I didn't bring out a gun. I didn't shoot. I left. I got shot and ran. So is that self-defense? Find the guns."

The Riverside County District Attorney had charged Archuleta with murder (§ 187, subd. (a)) and being a felon in possession of a firearm (§ 29800, subd. (a)), and alleged he personally and intentionally discharged a firearm in committing the murder (§ 12022.53, subd. (d)). The jury acquitted Archuleta of first degree murder, but found him guilty of second degree murder. They also found not true the allegation that he personally and intentionally discharged a firearm and hung on the gun possession charge. The trial court dismissed the possession charge at the People's request and sentenced Archuleta to an indeterminate term of 30 years to life plus two years for the prior prison term enhancements.

9

Archuleta timely appealed.

## II

## ANALYSIS

Archuleta argues the trial court committed reversible error by instructing the jury on contrived self-defense (CALCRIM No. 3472) and consciousness of guilt (CALCRIM Nos. 362, 371, 372). As we explain below, we disagree on both points.

A.     *Applicable Legal Principles*

A trial court is required to instruct the jury on all principles of law relevant to the issues raised by the evidence, regardless of whether the defendant asks for a particular instruction. (*People v. Blair* (2005) 36 Cal.4th 686, 744.) Every instruction must be complete and correctly state the law. (*People v. Fiu* (2008) 165 Cal.App.4th 360, 370.) We independently review whether an instruction correctly states the law (*People v. Posey* (2004) 32 Cal.4th 193, 218), and for all other challenges, we "assess the instructions as a whole, viewing the challenged instruction in context with other instructions, in order to determine if there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner." (*People v. Wilson* (2008) 44 Cal.4th 758, 803.)

A defendant challenging a jury instruction "must demonstrate a reasonable likelihood that the jury understood the instruction in the way [he or she has] asserted." (*People v. Covarrubias* (2016) 1 Cal.5th 838, 905.) "'[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation.' [Citation.] In reviewing an ambiguous instruction, we inquire whether there is

a reasonable likelihood that the jury misunderstood or misapplied the instruction in a manner that violates the Constitution. [Citation.] 'A single instruction is not viewed in isolation, and the ultimate decision on whether a specific jury instruction is correct and adequate is determined by consideration of the entire instructions given to the jury.'" (*Id.* at p. 906.) We presume the jurors are intelligent and capable of understanding and applying the court's instructions. (*Id.* at p. 905.)

B.      *CALCRIM No. 3472: Contrived Self-Defense*

The trial court instructed the jury on the lesser included offense of voluntary manslaughter based on an imperfect self-defense theory. Although defense counsel did not request instructions on the lesser, the trial court gave them based on the evidence adduced at trial—specifically, Erica's testimony that Archuleta had told her he shot Vargas because he thought Vargas was going to shoot him. The court instructed the jury with CALCRIM No. 571 on imperfect self-defense which says, among other things, that the theory is inapplicable "when the defendant, through his own wrongful conduct, has created circumstances that justify his adversary's use of force." The court also instructed the jury with CALCRIM No. 3472, the challenged instruction, which says, "A person does not have the right to self-defense if he provokes a fight or quarrel with the intent to create an excuse to use force."

11

Relying on *People v. Ramirez* (2015) 233 Cal.App.4th 940 (*Ramirez*), Archuleta argues CALCRIM No. 3472 is an incorrect statement of the law and precluded the jury from considering an imperfect self-defense theory. There are multiple problems with this argument.

First, Archuleta forfeited his challenge to the contrived self-defense instruction by failing to raise any objection with the trial court. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1191-1192.) Second, CALCRIM No. 3472 is a correct statement of law. In *People v. Enraca* (2012) 53 Cal.4th 735, our Supreme Court addressed the propriety of the CALJIC analog and predecessor to CALCRIM No. 3472—CALJIC No. 5.55. (*Enraca*, at p. 761.) That instruction says, "The right of self-defense is not available to a person who seeks a quarrel with the intent to create a real or apparent necessity of exercising self-defense." (*Ibid.*) The court explained the instruction was legally accurate because self-defense "may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical attack or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified." (*Ibid.*) Our colleagues in the Second District concluded that *Enraca's* holding applies equally to CALCRIM No. 3472 because "the language of the two instructions is materially the same." (*People v. Eulian* (2016) 247 Cal.App.4th 1324, 1333 (*Eulian*).) We agree.

12

CALCRIM No. 3472 describes a situation where a defendant provokes a fight or argument *for the purpose of* creating a larger conflict which would allow them to engage in further violence in the name of self-defense. In other words, the instruction applies to circumstances where the defendant intentionally contrives a situation in which they will have an excuse to use force against the victim. CALCRIM No. 3472 and contrived self-defense do not apply where the defendant provokes a fight using nondeadly force *without an intent* to create a larger conflict to excuse the use of further violence.

Here, the trial court's use of CALCRIM No. 3472 was appropriate because there was substantial evidence that Archuleta intentionally created a situation (i.e., an argument where he brandished his gun) that would give him an excuse to use his gun against Vargas. Erica told the jury that Archuleta's purpose in confronting Vargas was to retrieve Freddy's guns and retaliate against him for Freddy's murder. She told the jury Archuleta and his friends drove around looking for Vargas, and when they found him, Archuleta went into the apartment armed and told everyone but Vargas to leave. J.N. told the police that before any gunshots were fired, he heard someone ask, "What's up with your strap?" meaning someone had made it known they were carrying a gun. From this evidence, a reasonable juror could conclude that Archuleta had pulled his gun first, perhaps to show he was serious about retrieving the guns. And thus, even if Vargas met the demand by also pulling out a gun, the jury could conclude he did so only in response to Archuleta's initial assault. In short, the evidence supports an inference that Archuleta went to J.N.'s apartment looking for a gunfight.

13

Archuleta's reliance on *Ramirez* does not help his case. There, the jury heard testimony from multiple witnesses that the defendant and his friends had confronted a group of rival gang members intending to instigate a fistfight only. The defendant testified that they had agreed not to bring any guns to the confrontation but he secretly violated the pact by hiding a gun in his sweatshirt—for protection, in case his rivals were armed. He was right, his rivals were armed, and when the fistfight started and one of them pulled out a gun, the defendant was quicker and shot first. Over a lengthy dissent by Justice Fybel, the *Ramirez* court concluded that in the rare circumstance where the evidence shows the defendant intended to provoke only a fistfight (or use similar nondeadly force), it is error to instruct the jury with CALCRIM No. 3472. The court explained that while the contrived self-defense instruction is generally a correct statement of law, it prejudiced the defendant because it allowed the jury to conclude he had forfeited his right to self-defense by using *any amount* of force. (*Ramirez*, *supra*, 233 Cal.App.4th at p. 947.) In other words, the instruction should not have been given on that record because it "made no allowance for an intent to use only nondeadly force and an adversary's sudden escalation to deadly violence." (*Id.* at p. 945.)

At least one court has questioned *Ramirez's* holding. (See *Eulian*, *supra*, 247 Cal.App.4th at p. 1334 ["Although '[t]he instruction misstates the law' according to *Ramirez*, . . . we believe the opposite is true. CALCRIM No. 3472 is generally a correct statement of law, which *might* require modification in the *rare* case in which a defendant intended to provoke only a nondeadly confrontation and the victim responds with deadly

14

force"] italics added.) But we need not decide whether we agree with the holding because our case is distinguishable from *Ramirez* in a crucial aspect. Unlike the defendant there, Archuleta did not claim he intended to provoke only a nondeadly fight nor did he claim he shot Vargas in self-defense. Instead, he affirmatively *disclaimed* any theory of self-defense and argued he wasn't the shooter. But putting aside the defense's theory of the case, there simply is no support in the record for a *Ramirez*-like fistfight. Tiffany heard the people inside the apartment arguing about Freddy and guns; Erica said Archuleta believed Vargas killed Freddy and she believed he intended to retaliate against Vargas for that fact; and Freddy's brother texted Archuleta during the altercation to "finish" Vargas. This evidence strongly suggests the group went looking to retaliate *with deadly force* against the person they believed had murdered their friend and stolen his guns. As the *Ramirez* court acknowledged, "a defendant who assaults his victims with a gun may not set up a valid self-defense claim with evidence he believed the victims also reached for a gun, since they would be justified in meeting deadly force with deadly force." (*Ramirez*, *supra*, 233 Cal.App.4th at p. 948.)

The third and final problem with Archuleta's challenge to CALCRIM No. 3472 is that even if he could show the instruction was erroneous, we would conclude the error was harmless beyond a reasonable doubt based on the jury's verdict. (*Chapman v. California* (1967) 386 U.S. 18, 24.) The jury acquitted Archuleta of first degree murder, found he did not fire a gun, and hung on whether he was even carrying one that night (count 2). In other words, by finding Archuleta was an accomplice to the murder, the

15

jurors expressly rejected any theory of self-defense, which could apply only if they found he was the shooter. The verdict demonstrates the jury disbelieved at least parts of Erica's testimony and credited the defense theory that Archuleta had not been the one to shoot Vargas. On this record, Archuleta cannot show that CALCRIM No. 3472 had any effect on the outcome of the trial.

      C.     *Consciousness of Guilt Instructions*

Archuleta contends the consciousness of guilt instructions given to the jury—CALCRIM Nos. 362, 371, and 372—were duplicative of the circumstantial evidence instructions, argumentative, and permitted the jurors to draw irrational inferences of guilt against him. We disagree. Although he has also forfeited these arguments by failing to object to any of the consciousness of guilt instructions during trial, we nevertheless conclude they fail on the merits.

CALCRIM No. 362 applies when a defendant gives false statements. "If the defendant made a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt. [¶] If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself." CALCRIM No. 371 applies when a defendant attempts to fabricate false evidence. "If the defendant tried to create false evidence or obtain false testimony, that conduct may show that he was aware of his guilt. If you conclude that the

16

defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself." And CALCRIM No. 372 applies when a defendant flees a crime scene. "If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself."

The California Supreme Court has repeatedly rejected the arguments against California's consciousness of guilt instructions that Archuleta raises here. Specifically, our high court has held that the CALJIC analogs to the CALCRIM consciousness of guilt instructions do not duplicate instructions on circumstantial evidence. (*People v. Page* (2008) 44 Cal.4th 1, 50 [CALJIC No. 2.03 on giving false statements is not duplicative of circumstantial evidence instructions]; *People v. Cage* (2015) 62 Cal.4th 256, 285-286 [same conclusion regarding CALJIC No. 2.52 which covers fleeing a crime scene]; *People v. Thornton* (2007) 41 Cal.4th 391, 437-438 [concluding CALJIC 2.06 regarding suppressing evidence is constitutional].) The court has also repeatedly held that the consciousness of guilt instructions are not argumentative. (See, e.g., *Page*, at pp. 50-51; *People v. Howard* (2008) 42 Cal.4th 1000, 1024-1025; *People v. Nakahara* (2003) 30 Cal.4th 705, 713.) And finally, the court has also rejected arguments that the consciousness of guilt instructions invite the jury to draw irrational inferences about a defendant's state of mind at the time the offense was committed. (*People v. Crandell*

17

(1988) 46 Cal.3d 833, 870; *Howard*, at p. 1021; *Nakahara*, at p. 713; *People v. Jackson* (1996) 13 Cal.4th 1164, 1224; *Thornton*, at p. 438 ["The cautionary nature of the instructions . . . benefits the defense, admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory. . . . We have rejected claims that consciousness-of-guilt instructions permit the trier of fact improperly to draw inferences about a defendant's state of mind"].)

We view this precedent as binding on the issues Archuleta raises because the CALJIC consciousness of guilt instructions are materially the same as the CALCRIM consciousness of guilt instructions.[1] (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) The record amply supports giving the consciousness of guilt instructions. There was evidence Archuleta fled the scene of Vargas's shooting, gave

---

[1] CALJIC No. 2.03 on giving false statements says: "If you find that before this trial the defendant made a willfully false or deliberately misleading statement concerning the crimes for which he is now being tried, you may consider such statement as a circumstance tending to prove a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are for you to decide." (CALJIC No. 2.03 (7th ed. 2005).)

CALJIC No. 2.06 on suppressing evidence states: "If you find that a defendant attempted to suppress evidence against himself in any manner, such as by destroying evidence or by concealing evidence, this attempt may be considered by you as a circumstance tending to show a consciousness of guilt. However, this conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are for you to decide." (CALJIC No. 2.06 (7th ed. 2005).)

CALJIC No. 2.52 on flight states: "The flight of a person immediately after the commission of a crime, or after he is accused of a crime, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding whether a defendant is guilty or not guilty. The weight to which this circumstance is entitled is a matter for you to decide." (CALJIC No. 2.52 (7th ed. 2005).)

18

false statements about the shooting to Erica, and also lied to the police when they interviewed him in the hospital before his surgery. We conclude the trial court did not err by instructing the jury with CALCRIM Nos. 362, 371 and 372.

D.    *The Prison Prior Enhancements Are Unauthorized*

While this appeal was pending, S.B. 136 became effective, amending Penal Code section 667.5 to eliminate one-year enhancements for all offenses except sexually violent prior offenses as defined in Welfare and Institutions Code section 6600, subdivision (b). Archuleta argues, and the People correctly concede, that the new law applies to his case because it's ameliorative in nature and his judgment was not final when it became effective. (See, e.g., *People v. Jennings* (2019) 42 Cal.App.5th 664, 682.) Because the trial court imposed the maximum sentence, there is no reason to remand for resentencing, and instead we will modify Archuleta's sentence on appeal. (*People v. Buycks* (2018) 5 Cal.5th 857, 893, 896, fn. 15.)

## III

## DISPOSITION

We modify the judgment to strike the two prison prior enhancements from Archuleta's sentence, but in all other respects affirm the judgment. We direct the trial court to issue a new abstract of judgment consistent with this disposition and forward a

copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH
J.

We concur:

RAMIREZ
P. J.

MENETREZ
J.