Filed 3/30/22  P. v. Fiu CA1/4
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>NEIL FIU,<br><br>    Defendant and Appellant. | A160536<br><br>(Contra Costa County Super. Ct. No. 5-041756-8) |

A jury convicted Neil Fiu of, among other things, second degree murder (Pen. Code[1], § 187) of Salvador Espinoza.  After the enactment of Senate Bill No. 1437 (2017–2018 Reg. Sess.), Fiu filed a petition for relief under section 1170.95 alleging that his conviction was based upon the felony murder rule or the natural and probable consequences doctrine.  Fiu contends that the trial court erred in denying his section 1170.95 petition. Finding no error, we affirm.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

1

# BACKGROUND

## *The Trial and Verdict*[2]

On the evening of July 24, 2003, Fiu, an "old gangster" who was a member of the Sons of Death (SOD) street gang, was hanging out on the porch of his home, drinking with teenage SOD members Sammy V., Brandon V., Danny G., and Joey O. Fiu's step-son, Juan, and Juan's cousin, Luis Javier Cervantes, were also there. That evening, Espinoza walked by them, yelling disrespectfully. Joey O. and Cervantes testified that Espinoza yelled out "EHL" or "Easter Hill Locos," his gang's name.

When Espinoza walked by, Sammy V. testified that Fiu said to "go get him." Danny G. and Brandon V. started chasing Espinoza. They caught him and started punching and kicking him. Sammy V. said he went over and kicked Espinoza a couple of times on his lower body while Espinoza was on the ground. Sammy V. heard someone yell "SOD" while he was kicking Espinoza. He testified that Espinoza was kicked for about five to ten minutes, and Fiu kicked Espinoza multiple times in the head. Danny G. had a gun and pulled it out when he caught Espinoza, but someone, Sammy V. wasn't sure who, told Danny G. to put it away. Sammy V. denied that Fiu knocked the gun out of Danny G.'s hands.

Joey O. testified that he went to Fiu's house on the night of July 24, 2003, with Danny G., Brandon V., and Sammy V.

---

[2] Fiu augmented the record on appeal with a full set of the reporter's transcripts from his trial, but we recite and rely on only the evidence introduced in his section 1170.95 hearing.

Cervantes was also there. Joey O. said that Espinoza called out his gang name as he went by, everyone started walking towards Espinoza, and then Brandon V. picked Espinoza up and threw him on the ground. Danny G. said "SOD," and pulled out a gun. Joey O. denied that Fiu told anyone to stop, and he testified that Danny G. put the gun away when they got Espinoza on the ground. Joey O. testified that he did not kick Espinoza, but Danny G. and Fiu did. Fiu kicked Espinoza in his face, and that kick rendered the victim unconscious. When asked whether he knew how many times Espinoza was kicked, Joey O. said, "I only know of one really." He saw "one particularly hard" blow to Espinoza's head. While Joey O. testified that he wasn't sure whether others aside from Danny G. and Fiu kicked the victim, he agreed it was fair to say there was a frenzy of punching and kicking.

Danny G. testified he believed that when Espinoza came by, Fiu said something like, "Go kill him." Danny G. then said he did not remember Fiu's exact words, "but he did tell me to go do something with the gun." Danny G. said he put the gun in the victim's face, but Fiu took it away, saying, "Don't shoot him." Danny G. said there were two assaults that night separated by ten to fifteen minutes. At one point, Fiu did tell them to "just go home and if the guy got up to start more problems, just be ready for him." Danny G. described a "frenzy" of kicking in the first assault. He told police that Fiu kicked Espinoza only once in the stomach.

Brandon V. testified that Espinoza walked by and was disrespecting them. He got into a fight with Espinoza, and everyone at the house, including Fiu, Danny G., Joey O., Sammy V., Cervantes, and Juan, joined the fight. Brandon V. knocked Espinoza down, Espinoza tried to run away, and Brandon V. knocked him down again. Brandon V. said he kicked Espinoza on the side. Many others kicked him as well. A police officer testified that Brandon V. told him that Fiu ran three steps, cocked his leg, and kicked Espinoza in the head, after which Espinoza went unconscious. At trial, Brandon V. denied that Fiu took a running kick at the victim; he said, however, he thought Fiu knocked the victim unconscious after kicking him in his "upper body, somewhere around there," but he did not know. Brandon V. told police the victim went limp after Fiu kicked him. At some point, they stopped kicking the victim and went back to Fiu's porch. Brandon V. denied that Danny G. had a gun. He testified that Cervantes kicked the victim the hardest, and he told police that Cervantes went "crazy" on the victim.

Cervantes testified that, on the evening of July 24, 2003, four younger kids whom he did not know came over to Fiu's house and hung out on the porch and started drinking. The victim passed by, stumbling such that Cervantes surmised he was drunk, and he started throwing gang signs and said, "Easter Hill Locos." Thereafter, a "big ol' fight" happened. One of the young guys ran up to the victim and pointed a gun at him, and Fiu took the gun. The fight that ensued was even for "about five seconds." Then, the victim fell down and started getting "stomped." All of

4

the kids were kicking the victim like a football.  Fiu kicked him in the upper body near the head.  Cervantes later stated that what he saw with respect to Fiu was closer to five or six "stomps" on the victim's chest.

Espinoza lay on the ground not moving, and his assailants went back to the front porch of Fiu's house.  Danny G. testified that, when they left Espinoza the first time, he was "breathing a lot, but he couldn't like really -- really move or nothing."  Brandon V. testified that he thought Espinoza was alive after the first beating "because I don't think we really hurt him that bad."

Anywhere from ten to twenty minutes after the first attack ended, Ezekiel Johnson showed up.  Brandon V. testified that Johnson said he wanted to kill Espinoza, and Fiu said to leave him alone.  At that point, Brandon V. said that Espinoza was laying on the curb, and he appeared to be hurt from the first assault.  Sammy V. testified that Johnson said, "He's got to go before he starts snitching."  Brandon V. testified that Johnson went over and started beating up Espinoza even more.  He also said that Danny G. and Sammy V. went back to Espinoza with Johnson and started attacking him a second time.  Brandon V. testified that when the second attack happened, Espinoza was not in the same place as where they had assaulted him during the first attack.

Many witnesses testified that Johnson put a milk crate on Espinoza's head or neck during the second attack and started jumping on it.  Cervantes said Johnson stood on the crate on the victim's neck and tried to choke him to death.  Brandon V.

testified that Sammy V. and Danny G. kicked Espinoza, and Cervantes said that Johnson kicked him in the head. Multiple witnesses testified that Johnson stabbed the victim in the neck during the second attack. Some said that Joey O. also stabbed the victim. Cervantes, Joey O., Brandon V., and Danny G. said that Fiu did not participate in the second attack. Brandon V. testified that Fiu told everyone to leave Espinoza, and Cervantes said that Fiu had told everyone to go home at some point before Johnson showed up. At some point during the second attack, the assailants took Espinoza's clothes. No one called an ambulance.

Dr. Reiber, the forensic pathologist who performed an autopsy on Espinoza, testified that Espinoza died from blunt force trauma to the head. Espinoza did not die from the stab wounds to his neck, and he was alive when stabbed. Dr. Reiber identified multiple blows to Espinoza's head based on the injuries' different configurations, and death was caused by a combination of blunt injuries to the head. No single blow was severe enough to do all the damage. "[A]t least half a dozen separate blows had a significant role in causing his death." Dr. Reiber testified that Espinoza lingered for "at least a few hours" before he died.

A jury found Fiu guilty of second degree murder (§ 187), conspiracy to commit assault with force likely to cause great bodily injury (§ 182, former § 245, subd. (a)(1)), street terrorism (§ 186.22, subd. (a)), and assault with force likely to cause great bodily injury (former § 245, subd. (a)(1)). The jury also found that Fiu committed the murder and the conspiracy offenses to benefit

6

a criminal street gang (§ 186.22, subd. (b)(1)). The trial court found that Fiu had suffered a prior strike conviction (§§ 667, 1170.12) and sentenced him to 40 years to life.[3]

### *The Section 1170.95 Petition*

In January 2019, Fiu filed a section 1170.95 petition. The trial court appointed counsel, reviewed briefing, and issued an order to show cause.

After an evidentiary hearing, the trial court denied the petition. In its oral ruling, the court first addressed the standard of proof to be applied. Supported by the parties' agreement on this issue, the court applied a substantial evidence test, finding that a reasonable juror properly instructed on the current law "could find the elements of second degree implied malice murder" based on the evidence presented, and that the same juror "could find that [Fiu's] acts of kicking the victim in the head were a substantial factor in causing the victim's death."

As to its causation finding under this substantial evidence standard, the court explained, "The victim died from multiple blunt-force trauma to the head, not from being kicked elsewhere in the body and not from the stab wounds to the neck, as I noted. [¶] The fact that the victim apparently did not die between the first assault by the defendant and the young members of the gang, between that assault and the second assault 10 or 15 minutes later by Mr. Johnson and the young members of the

---

[3] This court affirmed Fiu's convictions but modified his sentence to 30 years to life. (*People v. Fiu* (2008) 165 Cal.App.4th 360, 389–390.)

7

gang, is not an impediment to a finding of causation. [¶] As I noted, Dr. Reiber testified that the victim would have taken several hours to die from the kicks in the head and face, whether they occurred in the first or second assault or both. And I do find it was both." The court added, "Moreover, I think, more importantly, the jury who convicted the defendant of second degree murder was properly instructed on the law of causation and, by its verdict, the jury necessarily found beyond a reasonable doubt that [Fiu's] acts were a substantial factor in causing the death of the victim."

The court then made an alternative ruling under a different standard of proof. It specifically ruled, "I also note that if I were to apply a different standard, which neither party has argued here, if I were to be sitting as a sole juror or as a, quote, '13th juror,' I would find that the evidence admitted at this hearing does prove beyond a reasonable doubt that the defendant is guilty of second-degree murder on an implied malice theory and that causation was proved beyond a reasonable doubt."

Fiu timely appealed.

## I. DISCUSSION

Fiu presents three arguments in his opening brief: 1) the trial court applied the wrong standard of proof at his section 1170.95 evidentiary hearing; 2) the trial court erred in finding that the jury who convicted him necessarily found the causation required for murder; and 3) his counsel provided ineffective assistance by failing to introduce certain trial testimony in the section 1170.95 hearing. In his supplemental opening brief, Fiu

8

reiterates his standard of proof argument in light of the enactment of Senate Bill No. 775 (2021–2022 Reg. Sess.; Stats. 2021, ch. 551, § 2). He also argues that de novo review applies to the trial court's factual finding of implied malice, and he urges us to find that the prosecution failed to satisfy its burden of proof on this element. We address each argument below.

### A. Statutory Background

Effective January 1, 2019, Senate Bill No. 1437 changed the law of homicide by amending the felony murder rule and the natural and probable consequences doctrine as it relates to murder. (*People v. Gentile* (2020) 10 Cal.5th 830, 842–843 (*Gentile*).) The Legislature amended the felony murder rule by adding section 189, subdivision (e), which provided that a participant in the qualifying felony is liable for felony murder only if the person: (1) was the actual killer; (2) was not the actual killer but, with the intent to kill, acted as a direct aider and abettor; or (3) was a major participant in the underlying felony and acted with reckless indifference to human life. (See *Gentile*, at p. 842.) The Legislature amended the natural and probable consequences doctrine by adding subdivision (a)(3) to section 188, which states that "[m]alice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).)

Section 1170.95 offered potential sentencing relief for persons who were "convicted of first degree or second degree murder" under a felony murder theory or the natural and probable consequences theory. (Former § 1170.95, subd. (a).)

9

Such a person could seek resentencing by filing a petition in the sentencing court with specified information. (Former § 1170.95, subds. (a), (b).) The trial court was then to review the petition to determine if the petitioner made a prima facie case for relief. (Former § 1170.95, subd. (c).) If the petitioner made the requisite prima facie showing, the trial court was required to issue an order to show cause and to hold an evidentiary hearing to determine whether to vacate the conviction, recall the sentence, and resentence the petitioner as set forth in the statute. (Former § 1170.95, subd. (d)(1).)

Effective January 1, 2022, Senate Bill No. 775 expanded section 1170.95's scope and amended its procedures.[4] (Stats. 2021, ch. 551.) As relevant here, Senate Bill No. 775 clarified the standard of proof applicable at the section 1170.95, subdivision (d) evidentiary hearing, which was an unsettled question at the time of Fiu's hearing. Some decisions published after Fiu's section 1170.95 hearing held that the prosecution had to prove beyond a reasonable doubt that a reasonable jury could find the defendant guilty of murder. "This is essentially identical to the standard of substantial evidence, in which the reviewing court asks ' "whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt . . . ." ' " (*People v. Duke* (2020) 55 Cal.App.5th 113, 123 (*Duke*), review granted Jan. 13, 2021, and cause transferred Nov. 23, 2021,

---

[4] Among other things, the new legislation allows defendants to challenge convictions for attempted murder obtained under theories that SB 1437 rendered invalid. (§ 1170.95, subd. (a).)

10

S265309.)  But the majority position was that the prosecution had to convince the trial court, sitting as an independent factfinder, of the petitioner's guilt beyond a reasonable doubt. (See *People v. Lopez* (2020) 56 Cal.App.5th 936, 949, review granted Feb. 10, 2021, and cause transferred Dec. 22, 2021, S265974; *People v. Ramirez* (2021) 71 Cal.App.5th 970, 984.) Senate Bill No. 775 clarified that the independent-factfinding standard applies, and the statute now provides, "At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder . . . under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019 . . . . A finding that there is substantial evidence to support a conviction for murder . . . is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing."  (§ 1170.95, subd. (d)(3).)

### B. Errors Regarding the Duke *Standard and Causation Finding Thereunder Were Harmless*

Fiu argues that the trial court incorrectly applied the "*Duke* standard" at his section 1170.95 evidentiary hearing.  He also contends that, when addressing causation, the court erroneously found that the jury in his trial necessarily determined that Fiu's actions were a substantial factor in causing Espinoza's death, when the jury instructions instead allowed for Fiu's conviction without such a finding under the natural and probable consequences doctrine.  Respondent concedes error in the use of the *Duke* standard and in the trial court's finding that the jury

11

necessarily found causation beyond a reasonable doubt. Nonetheless, respondent argues that Fiu suffered no prejudice from these errors. Respondent is correct.

Any error that occurred below was harmless. The trial court did use the "*Duke* standard," and, in bolstering its causation ruling thereunder, it also found that the jurors who convicted Fiu, by their verdict, "necessarily found beyond a reasonable doubt that [Fiu's] acts were a substantial factor in causing the death of the victim." But the trial court went on to rule in the alternative that "if I were to be sitting as a sole juror or as a, quote, '13th juror,' I would find that the evidence admitted at this hearing does prove beyond a reasonable doubt that the defendant is guilty of second degree murder on an implied malice theory and that causation was proven beyond a reasonable doubt." Given this alternative ruling—which was independent of the *Duke* standard and the court's interpretation of the jury's verdict—no reversible error occurred.

### C. Ineffective Assistance of Counsel

Fiu contends his counsel provided ineffective assistance in violation of the Sixth Amendment of the United States Constitution by failing to introduce the following evidence: 1) Danny G. answered affirmatively when asked of the first assault, "When you had last left the body on the ground, did it move at all?"; 2) Brandon V. testified that Espinoza was not in the same place for the second beating as he had been when Brandon V. knocked him down for the first beating; and 3) Yolanda C. testified that Espinoza spoke at the beginning of the second

12

assault. According to Fiu, this evidence showed that Espinoza recovered consciousness before the second assault and therefore shed a different light on the question of whether he could be deemed legally responsible for the consequences of the second beating.

" 'In order to establish a claim of ineffective assistance of counsel, defendant bears the burden of demonstrating, first, that counsel's performance was deficient because it "fell below an objective standard of reasonableness [¶] . . . under prevailing professional norms." [Citations.] Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." [Citation.] If the record "sheds no light on why counsel acted or failed to act in the manner challenged," an appellate claim of ineffective assistance of counsel must be rejected "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." [Citations.] If a defendant meets the burden of establishing that counsel's performance was deficient, he or she also must show that counsel's deficiencies resulted in prejudice, that is, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ' " (*People v. Bell* (2019) 7 Cal.5th 70, 125.)

Assuming that Fiu had a Sixth Amendment right to effective assistance of counsel, he does not establish a violation of

that right.[5]  Contrary to Fiu's assertion on appeal, Brandon V.'s testimony that Espinoza was not in the same place for the second assault as he had been for the first assault was introduced in the section 1170.95 hearing. Fiu's counsel could have reasonably decided that Danny G.'s and Yolanda C.'s testimony, which Fiu argues went to show that Espinoza recovered consciousness, was duplicative.  Fiu also has not shown prejudice.  The trial court had before it Brandon V.'s testimony supporting the inference that the victim moved between attacks, Danny G.'s testimony that Espinoza was alive after the first attack, Sammy V.'s testimony that Espinoza made "like, little, like cries" during the second attack, and Dr. Reiber's testimony that it took several hours for Espinoza to die.  The court credited this evidence, recognizing in its order that Espinoza apparently did not die between the first and second attack.  Given the evidence already before the court suggesting that Espinoza regained consciousness after the first assault and the evidence regarding the length of time it took for Espinoza to die, there is no reasonable probability that Fiu would have obtained a more favorable result had the

---

[5] Whether a petitioner has a federal constitutional right to effective assistance of counsel in a section 1170.95 proceeding is unclear.  Section 1170.95 provides for the appointment of counsel. (§ 1170.95, subd. (b)(3).)  However, "the relief granted by Senate Bill No. 1437, in which section 1170.95 is included, is an act of lenity not subject to Sixth Amendment analysis." (*People v. James* (2021) 63 Cal.App.5th 604, 606.)  Because Fiu has not shown his counsel provided ineffective assistance, we do not decide this issue.

above-described testimony from Yolanda C. and Danny G. been introduced.

## D. Sufficient Evidence of the Mental Component of Implied Malice

Fiu next contends that the evidence introduced at his section 1170.95 hearing did not prove beyond a reasonable doubt that he harbored the mental component of implied malice—that is, that he knew his conduct endangered the life of another and that he acted with conscious disregard for life. We first address the standard of review applicable to this challenge and then turn to the merits.

### 1. Standard of Review

The parties disagree as to which standard of review applies to the trial court's finding that the evidence established beyond a reasonable doubt that Fiu acted with implied malice. Relying on *People v. Vivar* (2021) 11 Cal.5th 510 (*Vivar*), cases involving habeas corpus petitions, and cases addressing dismissals of capital jurors for bias based on juror questionnaire responses, Fiu contends we should review de novo the trial court's factual findings. He maintains that, because the trial court's inquiry was limited to a cold record and the judge who decided the section 1170.95 petition was not the trial judge, the court below had no advantage over us when making factual findings at the section 1170.95 hearing. In contrast, respondent argues that the trial court's factual findings should be reviewed for substantial evidence, the traditional standard of appellate review of factual findings. We agree with respondent.

15

In *Vivar*, our Supreme Court addressed section 1473.7, which currently provides that one who is no longer in criminal custody to move to vacate a conviction or sentence where the "conviction or sentence is legally invalid due to prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a condition or sentence." (§ 1473.7, subd. (a)(1). The court held that an independent standard of review applies to prejudice determinations in connection with such a motion. (*Vivar, supra,* 11 Cal.5th at p. 528.) In so holding, the court reasoned that analogous prejudice determinations in ineffective assistance of counsel claims were reviewed independently as predominantly legal questions; prior appellate decisions had reviewed section 1473.7 prejudice determinations independently; and the Legislature, while aware of this standard, did not alter it. (*Id.* at pp. 524–526.) The court additionally reasoned that its embrace of independent review fit with how section 1473.7 motions were brought because such motions necessarily arise after the defendant serves his or her sentence and are determined on a cold record. (*Id.* at pp. 526–527.) "So our embrace of independent review in this context is a product of multiple factors with special relevance here: the history of section 1473.7, the interests at stake in a section 1473.7 motion, the type of evidence on which a section 1473.7 ruling is likely to be based, and the relative competence of trial courts and appellate courts to assess that evidence." (*Id.* at p. 527.) But the court made clear that its

16

holding applied only to section 1473.7 prejudice determinations. (*Id.* at p. 528, fn. 7.)

In contrast, in *People v. Perez* (2018) 4 Cal.5th 1055, 1066, which addressed a resentencing petition under Proposition 36, our Supreme Court rejected the argument that de novo review applies to a trial court's factual findings derived from a record of conviction. Proposition 36 allows inmates sentenced under the "Three Strikes" law to petition for a reduction in their sentence in certain circumstances, but a defendant who was armed with a deadly weapon during the commission of the latest offense is ineligible for a reduction. (*Perez*, at p. 1062.) In *Perez*, the trial court found from the record of conviction that the defendant was eligible for resentencing, rejecting the district attorney's position that the defendant was statutorily ineligible because he was armed with a deadly weapon. (*Id.* at p. 1061.) The court of appeal reversed, and the district attorney argued in the Supreme Court that it was appropriate to apply de novo review to the trial court's finding that defendant was not armed because the trial court had no advantage over an appellate court when making factual findings from a record of conviction. (*Id.* at pp. 1061, 1066.) The Supreme Court held that the substantial evidence standard of review applied. (*Ibid.*) It observed that the question of whether defendant was armed with a deadly weapon was one of fact, and "even if the trial court is bound by and relies solely on the record of conviction to determine eligibility [for sentencing relief under Proposition 36,] . . . we see no reason to withhold the deference generally afforded to such factual findings." (*Ibid.*)

We decline Fiu's invitation to apply independent review for a number of reasons. Whether Fiu acted with implied malice is a question of fact that the Legislature has clarified is to be decided by the trial judge (Stats. 2021, ch. 551, § 2), and the well-established appellate standard of review for factual findings, whether based on documentary evidence or live testimony, is for substantial evidence. (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 479; *Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711 & fn. 3; see also *Vivar, supra*, 11 Cal.5th at p. 528, fn. 7.) Even where factual findings are made from a cold record, " 'deference to the trial court's resolution of fact issues is warranted by jurisdictional considerations and a recognition of the distinctive roles of trial and appellate courts: Trial courts decide questions of fact and appellate courts decide questions of law.' " (*Vivar*, at p. 538 (conc. & dis. opn. of Corrigan, J.).) *Vivar*, and the cases applying de novo review to bias determinations derived from answers to juror questionnaires in capital cases (*People v. Stewart* (2004) 33 Cal.4th 425, 451), represent narrow exceptions to the general rule that are not applicable here. Cases involving original jurisdiction over petitions for habeas corpus are also inapposite. (*Vivar, supra*, 11 Cal.5th at p. 537 (conc. & dis. opn. of Corrigan, J.).) ["[w]e should be hesitant here to uncritically apply a habeas corpus standard of review to appellate review of statutory claims."].) Moreover, we find *Perez* to be the most persuasive in answering the question posed here because our Supreme Court answered an analogous question therein and held that substantial evidence review applied to judicial factual

18

findings derived from a record of conviction. (*Perez*, *supra*, 4 Cal.5th at p. 1066.)

Finally, appellate courts reviewing a trial court's factual findings from an evidentiary hearing under section 1170.95 have applied substantial evidence review (*People v. Ramirez, supra*, 71 Cal.App.5th at p. 985, *People v. Williams* (2020) 57 Cal.App.5th 652, 663, *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1087), and at least one court has done so after rejecting the argument that *Vivar*'s independent review standard should be extended to factual findings the trial court makes from a cold record at a section 1170.95 evidentiary hearing. (*People v. Clements* (2022) 75 Cal.App.5th 276, 307.) We thus will apply the deference generally afforded to factual findings below. (*Perez*, *supra*, 4 Cal.5th at p. 1066.)

### 2. Substantial Evidence of Implied Malice

Murder is the unlawful killing of a human being or a fetus "with malice aforethought." (§ 187, subd. (a).) Only implied malice is at issue in this case. " ' "Malice is implied when the killing is proximately caused by ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' [Citation.] In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another . . . ." ' " (*People v. Palomar* (2020) 44 Cal.App.5th 969, 974.)

" 'On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] . . . .' The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507–508.) "All conflicts in the evidence are resolved in favor of the judgment . . . ." (*People v. Neely* (2009) 176 Cal.App.4th 787, 793.) "[W]e must . . . presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.]" (*People v. Jones* (1990) 51 Cal.3d 294, 314.) " ' " ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' " ' " (*Cravens*, at p. 508.)

*Cravens*, *supra*, 53 Cal.4th 500, is instructive in this case. In *Cravens*, the defendant and his friends confronted the victim, and a fight ensued. The defendant's friend fought the victim first, and then all the men kicked the victim. The victim was able to get up, but he was intoxicated, exhausted, and unsteady.

20

Defendant " 'coldcocked' " the victim while he was looking the other way, and the victim went unconscious, fell, and his head hit the concrete with a cracking sound.  (*Id.* at pp. 504–505.)  After the fight, the defendant bragged he had " 'punched [the victim] out' " and " 'put him to sleep.' "  (*Id.* at p. 506.)  The victim died of a skull fracture.  (*Id.* at p. 505.)  The California Supreme Court concluded that sufficient evidence supported the physical and the mental components of implied malice.  (*Id.* at p. 508–511.)  As to the mental component, the court found that the jury was allowed to infer malice from the circumstances of the attack, the natural consequences of which were dangerous to human life, and the verdict was supported by evidence that, before the fight, the defendant encouraged others to fight the victim and then took no steps to assist the victim after knocking him unconscious while his head was split open.  (*Id.* at p. 511.)

Here, the assault that Fiu, an "old gangster," instigated involved seven people against one victim who was a member of another gang.  One witness described it as an even fight for about five seconds, and then the group knocked Espinoza to the ground and he started getting "stomped."  From there, the assailants punched and kicked Espinoza on the ground for five to ten minutes in what at least two witnesses described as a "frenzy."  One witness testified that Fiu kicked Espinoza multiple times in the head.  Then, as Espinoza lay on the ground having been beaten by multiple assailants, Fiu kicked him in the head in a manner that rendered Espinoza unconscious.  Fiu does not dispute that sufficient evidence establishes the performance of an

21

act, the natural and probable consequences of which were dangerous to human life. As in *Cravens*, the jury could infer the mental element of malice therefrom, as well as from the evidence that Fiu instigated the assault. Fiu points to testimony that, after the first beating, he told everyone to leave Espinoza or to go home. But, at the same time, there was evidence that no one said to stop during the first beating. Rather, that beating stopped only because Fiu kicked Espinoza into unconsciousness and Espinoza "couldn't like really – really move" thereafter. Espinoza then lay outside on the ground while his assailants drank alcohol on Fiu's porch. No one ever called an ambulance. As in *Cravens*, this record contains sufficient evidence from which a reasonable trier of fact could find that the mental component of malice was proven beyond a reasonable doubt.

## DISPOSITION

The order denying Fiu's petition under section 1170.95 is affirmed.

BROWN, J.

WE CONCUR:

POLLAK, P. J.
DESAUTELS, J.[6]

*People v. Fiu* (A160536)

---

[6] Judge of the Superior Court of California, County of Alameda, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.